**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH DAKOTA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| **TIM TAYLOR, on behalf of** | ) | |
| **himself and others similarly situated; and** | ) | |
| **BRYCE BAKER on behalf of** | ) | |
| **himself and others similarly situated;** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:23-cv-03031-RAL** |
| | ) | |
| | ) | |
| **JBS FOODS USA; TYSON FOODS, INC.** | ) | |
| **CARGILL MEAT SOLUTIONS CORP.;** | ) | |
| **and NATIONAL BEEF PACKING** | ) | |
| **COMPANY, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT ........................................................................................................................... 4

I.    PLAINTIFFS' CLAIMS ARE NOT EXPRESSELY PREEMTPED
BY THE FMIA ........................................................................................................... 4

    A.  The Motion is Procedurally Improper……………………………………………4

    B.  Defendants Fail to Rebut the Presumption Against Preemption……………5

    C.  Under Applicable Law, the FMIA Does Not Preempt Plaintiffs' Claims..... 11

II.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE DORMANT
COMMERCE CLAUSE ........................................................................................... 23

    A.  The Motion is Procedurally Improper……………………………………………..23

    B.  Legal Standards for Dormant Commerce Clause........................................... 24

    C.  Plaintiffs' Lawsuit Invokes Laws and Rights Legitimately Aimed and
Protecting Consumers and Which Do Not Unduly Burden Interstate
Commerce ........................................................................................................ 25

    D.  Plaintiffs' Claims Do Not Impermissibly Interfere
With "Foreign Commerce……………………………………………………………..26

III.    PLAINTIFFS HAVE PLEADED ACTIONABLE STATE-LAW CLAIMS…..28

    A.  Plaintiffs Have Plausibly Stated That Defendants Use of False or Misleading
Labels on Foreign Beef Restraints the Plaintiffs' Ability to Compete Fairly in
the Market Causing an Antitrust Injury……………………………………...30

        1.  Plaintiffs Injuries are Sundry Losses Caused by Defendants Anti-
Competitive Sale of Foreign Beef Under a Misleading Label That Does Not
Comply with Federal Statutory and Regulatory
Requirements……………………………………………………..…31

        2.  Being a Rancher or Farmer Raising Beef Imparts No Knowledge of the
Packers Labeling Practices Once the Cattle Leave the Ranch or Farm…32

    B.  Plaintiffs Plausibly State a Claim for Unjust Enrichment…………………...33

**IV.   DEFENDANTS KNOWING VIOLATION OF FEDERAL LAW TO DEFRAUD CONSUMERS AND COMPETE UNFAIRLY IN A SCHEME TO PROFIT FROM THAT ILLEGAL ACTIVITY USING WIRES IS ACTIONABLE AND SUFFICIENTLY PLEADED**……………………………………………………**33**

    **A.  Defendants Overstate the Approval of the Statutorily Prohibited Labels and Understate Their Violation of the Law**………………………………………..**34**

    **B.  Petitioning for Guidance to Voluntarily Violate Federal Law and Regulations is Not Legitimate Speech or Petitioning Protected by the First Amendment**………………………………………………………………..**37**

    **C.  Again, Petitioners Dishonestly Overstate What Information a Typical Rancher or Farmer Would Have Access to Reasonably Discover the Deceit of the Packers in Their Labeling of Foreign Beef**…………………………**38**

    **D.  Plaintiffs RICO is Adequately and Plausibly Pleaded**………………………**38**

**V.   PLAINTIFF'S CLAIMS SHOULD NOT BE DISMISSED UNDER THE PRIMARY JURISDICTION DOCTRINE** ................................................... **39**

**VI.  DEFENDANTS MISAPPLY AND OVERSTATE THE IMPACT OF *BRISTOL-MYERS* IN THIS CASE** ........................................................................... **42**

**VII. AT A MINIMUM IF THE COURT DISMISSES THE COMPLAINT IT SHOULD BE WITHOUT PREJUDICE, THOUGH DEFENDANTS OFFER NO SOUND BASIS FOR DISMISSAL**………………………………………………..**45**

**CONCLUSION** ........................................................................................................... **45**

# TABLE OF AUTHORITIES

**Federal Cases**

*City of Philadelphia v. New Jersey*
437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) ................................................................. 24

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*
368 F.3d 1174 (9th Cir. 2004); ................................................................................................... 43

*Al Haj v. Pfizer Inc.*
338 F. Supp. 3d 815 (N.D. Ill. 2018) .......................................................................................... 44

*Ames v. Vavreck*
356 F. Supp. 931 (D. Minn. 1973); ............................................................................................. 30

*Anza v. Ideal Steel Supply Corp.*
547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). .......................................................... 35

*Appavo v. Philip Morris Inc.,*
No. 122469/97, 1998 WL 440036 (N.Y. Sup. Ct. July 24, l998) ................................................. 19

*Ashcroft v. Iqbal*
556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) ............................................................. 28

*Association of American Publishers, Inc. v. Frosh*
607 F. Supp. 3d 614 (D. Md. 2022) ............................................................................................. 5

*Badders v. United States*
240 U.S. 391 36 S.Ct. 367, 60 L.Ed. 706 (1916) ........................................................................ 36

*Barz v. Geneva Elevator Co.*
12 F.Supp.2d 943 (N.D.Iowa, 1998) ............................................................................................ 6

*Bates v. Dow Agrosciences LLC*
544 U.S. 431, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ................................................ 7, 9, 14, 22

*Bayou Fleet, Inc. v. Alexander*
234 F.3d 852 (5th Cir. 2000) ....................................................................................................... 37

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). ......................................................... 29

*BMS. Allen v. ConAgra Foods, Inc.*
No. 13-01279, 2018 WL 6460451 (N.D. Cal. Dec. 10, 2018) ..................................................... 43

iv

*Bristol-Myers Squibb Co. v. Superior Court*
―― U.S. ――, 137 S. Ct. 1773, 198 L.Ed.2d 395 (2017)- ........................................................ 42

*Bruesewitz v. Wyeth, LLC*
562 U.S. 223 (2011), ........................................................................................................ 10, 11

*California Federal Savings and Loan Ass'n v. Guerra*
479 U.S. 272 (1987) ................................................................................................................ 8

*Carpenter v. United States*
484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)). ...................................................... 36

*Casey v. Coventry Health Care of Kansas, Inc.*
No. 08-00201, 2009 WL 1616636 (W.D. Mo. June 9, 2009) ............................................ 6

*Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S.*
497 F.3d 972 (9th Cir. 2007) .............................................................................................. 7

*Central Laborers' Pension Fund v. Heinz,*
124 S. Ct. 2230, 541 U.S. 739, 748 (2004) ...................................................................... 6

*Chemical Specialties Manufacturers Association, Inc. v. Allenby*
958 F.2d 941 (9th Cir. 1992) .............................................................................................. 10

*Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*
450 U.S. 311 (1987) .............................................................................................................. 8

*Choimbol v. Fairfield Resorts*
428 F. Supp. 2d 437 (E.D. Va. 2006) ................................................................................ 36

*Christensen v. Harris County*
529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) .............................................. 1, 6

*Cipollone v. Liggett Group, Inc.*
505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ....................................... passim

*Clark v. Time Warner Cable*
523 F.3d 1110 (9th Cir. 2008) ............................................................................................ 40

*Crest Const. II, Inc. v. Doe*
660 F.3d 346 (8th Cir.2011). .............................................................................................. 39

*Crosby v. National Foreign Trade Council*
530 U.S. 363 (2000) .............................................................................................................. 5

*Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*
415 F.3d 1171 (10th Cir.2005). ........................................................................... 39

*Dep't of Revenue of Ky. v. Davis*
553 U.S. 328, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008). ........................................ 25

*Direct Mktg. Ass'n v. Brohl*
814 F.3d 1129 (10th Cir. 2016). .......................................................................... 24

*English v. General Electric Co.*
496 U.S. 72. 87 (1990) ..................................................................................... 10

*Envtl. Encapsulating Corp. v. City of New York*
855 F.2d 48 (2nd Cir. 1988) ................................................................................ 9

*First American Title Co. of South Dakota v. South Dakota Land Title Ass'n*
714 F.2d 1439 (8th Cir. 1983) ............................................................................. 5

*Florida Lime & Avocado Growers, Inc. v. Paul*
373 U.S. 132 (1963) ......................................................................................... 8

*Friends of Santa Fe County v. LAC Minerals, Inc.*
892 F. Supp. 1333 (D.N.M. 1995) ......................................................................... 40

*Guedry v. Ford*
431 F.2d 660 (5th Cir. 1970); ............................................................................. 30

*Hill v. R.J. Reynolds Tobacco Co.*
44 F.Supp.2d 837 (W.D. Ky. 1999) ...................................................................... 19

*Hilliard v. Williams*
465 F.2d 1212 (6th Cir. 1972). ........................................................................... 30

*Hillsborough County Fla. v. Automated Med. Labs. Inc.*
471 U.S. 707 (1985) ...................................................................................... 8, 9

*Hofeldt v. Mehling*
658 N.W.2d 783 (S.D. 2003)). ............................................................................ 33

*Holk v. Snapple Beverage Corp.*
575 F.3d 329 (3d Cir. 2009) ............................................................................... 20

*Hughes v. Oklahoma*
441 U.S. 322 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) .................................................. 25

vi

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*
335 F. Supp. 2d 126 (D. Me. 2004) ............................................... 43

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*
522 F.3d 6 (1st Cir. 2008) ........................................................... 43

*In re Pre–Filled Propane Tank Antitrust Litigation*
860 F.3d 1059 (8th Cir. 2017) ..................................................... 33

*In re Simon II Litigation*
211 F.R.D. 86 (E.D.N.Y. 2002) ................................................... 19

*Johnson v. Brown & Williamson Tobacco Corp.*
122 F.Supp.2d 194 (D.Mass. 2000) ............................................. 19

*Jones v. Rath Packing Co.*
430 U.S. 519, 97 S. Ct. 1305 (1977) ............................................ 16

*Kelly v. Cape Cod Potato Chip Co.*
81 F. Supp. 3d 754 (W.D. Mo. 2015) ....................................... 2, 7

*King v. Morrison*
231 F.3d 1094 (8th Cir. 2000) ...................................................... 6

*Kisor v. Wilkie*
139 S.Ct. 2400 (2019) ................................................................... 6

*Klehr v. A.O. Smith Corp.*
117 S.Ct. 1984, 521 U.S. 179 (U.S.,1997) ............................... 33, 38

*Knotts v. Nissan N. Am., Inc.*
No. 17-05049, 2018 WL 4922360 (D. Minn. Oct. 10, 2018) .......... 44

*Lazar v. Kroncke*
862 F.3d 1186 (9th Cir. 2017) .................................................... 24

*Lorillard Tobacco Co. v. Reilly*
533 U.S. 525 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) ................ 10

*Marin v. Clear Recon Corp.*
No. 19-5057, 2021 WL 6691698 (D.S.D. Dec. 1, 2021) ............ 5, 24

*Mario's Butcher Shop & Food Center., Inc. v. Armour & Co.*
574 F. Supp. 653 (N.D. Ill. 1983) ............................................... 21

vii

*Medtronic, Inc. v. Lohr*
518 U.S. 470 (1996) ............................................................................ 7, 9, 14, 20
*Molock v. Whole Foods Mkt. Group, Inc.*
2020 WL 1146733 (D.C. Cir. Mar. 10, 2020) .............................................. 43

*Mulford v. Altria Group, Inc.*
506 F. Supp. 2d 733 (D.N.M. 2007) .................................................... 7, 10, 26

*Mussat v. IQVIA, Inc.*
2020 WL 1161166 (7th Cir. Mar. 11, 2020) ................................................. 42

*Nat'l Meat Ass'n v. Harris*
565 U.S. 452, 466, 132 S. Ct. 965, 974, 181 L. Ed. 2d 950 (2012) ............. 21

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers' Ins. Co.*
514 U.S. 645 (1995) ....................................................................................... 10

*Nowell v. Medtronic Inc.*
372 F. Supp. 3d 1166 (D.N.M. 2019). ........................................................... 28

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*
511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) ................................... 25

*Pacific Gas & Electric Company v. Energy Resources Comm'n*
461 U.S. 190 (1983) ......................................................................................... 8

*Penniston v. Brown & Williamson Tobacco Corp.*
No. 99-CV-10628. 2000 WL 1585609 (D.Mass. June 15, 2000) .................. 19

*Perez v. Mortgage Bankers Ass'n*
35 S.Ct. 1199, 575 U.S. 92 (U.S., 2015) ......................................................... 6

*Pike v. Bruce Church, Inc.*
397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) ..................................... 25

*Plumley v. Massachusetts*
155 U.S. 461 15 S.Ct. 154, 39 L.Ed. 223 (1894) ............................................ 9

*Prudential Ins. Co. v. Benjamin*
328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) ..................................... 28

*R. E. Spriggs Co. v. Adolph Coors Co.*
37 Cal. App. 3d 653, 112 Cal. Rptr. 585(Ct. App. 1974) ............................... 8

*Ranchers-Cattlemen Action Legal Fund v. United States Dep't of Agric.*
2018 WL 2708747  (E.D. Wash. June 5, 2018) ............................................................. 16

*Rice v. Santa Fe Elevator Corp.*
331 U.S. 218 (1947) ........................................................................................................... 8

*Riegel v. Medtronic, Inc.*
552 U.S. 312, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008) ............................................ 22

*Saint Marys Hosp. of Rochester, Minnesota v. Leavitt*
535 F.3d 802 (8th Cir. 2008) ........................................................................................... 6

*Sancom, Inc. v. Qwest Communications Corp.*
643 F. Supp. 2d 1117 (D.S.D. June 19, 2009 ............................................................. 33

*Seagram & Sons v. Hostetter*
384 U.S. 35 (1966) ............................................................................................................. 5

*Shalala v. Guernsey Memorial Hosp.*
514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) ............................................... 6

*Silkwood v. Kerr-McGee Corp.*
464 U.S. 238 (1984) ......................................................................................................... 10

*Sloan v. Gen. Motors LLC*
287 F. Supp. 3d 840 (N.D. Cal. 2018) ................................................................... 44, 45

*Spain v. Brown & Williamson Tobacco Corp.*
363 F.3d 1183 (11th Cir. 2004) ..................................................................................... 19

*ThermoLife Int'l LLC v. NeoGenis Labs Inc.*
No. 18-02980, 2020 WL 6395442 (D. Ariz. Nov. 2, 2020) ........................................ 5

*Thornton v. Kroger Co.*
2022 WL 488932 (D.N.M. Feb. 17, 2022). ................................................................... 28

*Thornton v. Tyson Foods, Inc.*
28 F.4th 1016 (10th Cir. 2022) ................................................................................... 1, 2

*TON Services, Inc. v. Qwest Corp.*
493 F.3d 1225 (10th Cir. 2007) ..................................................................................... 39

*Torres v. Precision Industries, Inc.*
938 F.3d 752 (6th Cir. 2019) ........................................................................................... 5

*United States v. Curry*
461 F.3d 452 (4th Cir. 2006). ................................................................ 36

*United States v. Botefuhr*
309 F.3d 1263 (10th Cir.2002) ............................................................... 45

*United States v. Godwin*
272 F.3d 659 (4th Cir. 2001) ................................................................. 36

*United States v. Wynn*
684 F.3d 473 (4th Cir. 2012) ................................................................. 36

*von Kahle v. Cargill, Inc.*
No. 21-8532, 2022 WL 4096164 (S.D.N.Y., 2022)........................................ 5

*Walden v. Fiore*
571 U.S. 277 (2014)........................................................................... 42

*Wardair Canada v. Florida Dept. of Revenue*
477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). ....................................... 28

*Wos v. E.M.A. ex rel. Johnson*
133 S. Ct. 1391, 568 U.S. 627 (2013)................................................... 1, 5

**Federal Statutes**
5 U.S.C. § 553 ................................................................................. 6

7 U.S.C. § 1621 et seq......................................................................... 20, 40

15 U.S.C. § 1334 ............................................................................... 14,15

18 U.S.C. § 1341 .............................................................................. 36

18 U.S.C. § 1343 .............................................................................. 36

18 U.S.C.A. § 1962 ........................................................................... 35

21 U.S.C. § 607................................................................................ passim

21 U.S.C § 661 ................................................................................. 12

21 U.S.C. § 678................................................................................. 23

21 U.S.C.A. § 602 ............................................................................. 3, 4

21 U.S.C.A. § 610 ............................................................................. 21

21 U.S.C.A. § 678 ........................................................................................................ 13, 14, 15

28 U.S.C. § 1407 ................................................................................................................. 44

42 U.S.C. § 300 ................................................................................................................... 11

**Other Authorities**

2016 Consolidated Appropriations Act,
Pub. L. No. 114-113, 129 Stat. 2242 (2015); 7 U.S.C. §§ 1638, 1638a. ..................................... 41

Betsy J. Grey, *Make Congress Speak Clearly: Federal Preemption of State Tort Remedies*
77 Boston Univ. Law Rev. 559 (1997). ..................................................................................... 10

COME NOW, Plaintiffs Tim Taylor and Bryce Baker, by and through undersigned counsel of record Western Agriculture, Resource and Business Advocates, LLP (A. Blair Dunn, Esq. and Jared R. Vander Dussen, Esq.), The Law Offices of Marshall J. Ray (Marshall J. Ray, Esq.) and Preston Law Offices (Ethan M. Preston, Esq.) and provide their Response and Memorandum in Opposition to the Defendants' Motion to Dismiss. (ECF Doc. No. 23.)

## INTRODUCTION AND SUMMARY OF ARGUMENT

In their motion, Defendants JBS Foods USA, Tyson Foods, Inc., Cargill Meat Solutions Corp., and National Beef Packing Company, LLC (collectively "Defendants") contend that the Food Safety Inspection Service (FSIS) manual at issue gives them a license to lie to the American consumer by selling beef labeled as a "Product of the USA," which Defendants have willfully commingled with substantial amounts of imported beef for years. This dishonest practice is an unlawful enterprise for the purpose of profit, at the expense of honest American ranchers and farmers. It is no surprise, then, that Defendants' brief fundamentally distorts the applicable law. Defendants tout *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016 (10th Cir. 2022) (*Thornton II*) as authority for their position. The problem for them is that this Court is not bound by *Thornton*, and the dissent was the better-considered opinion.

The FSIS manual does not preclude Plaintiffs' claims. At the outset, not every communication by an agency constitutes law: documents like "'policy statements, agency manuals, and enforcement guidelines [] lack the force of law [and] do not warrant *Chevron*-style deference.'" *Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1402, 568 U.S. 627, 643 (2013) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)). As the dissent in *Thorton* showed, it "is hard to derive Congressional or agency intent for [the FSIS Food Standards and Labeling Policy Book] to preempt state law." *Thornton*, 28 F.4th

1

at 1032 n.3 (10th Cir. 2022) (Lucero, J., dissenting) ("mere agency guidance, as opposed to statutes or formal regulations, is not automatically entitled to preemptive effect," collecting cases). While the majority in *Thorton* concluded that "FSIS approval [was] dispositive that defendants' labels are not misleading," the majority relied on cases that were "all distinguishable because they did not rely on mere agency guidance to support a finding of preemption." Id. at 1032 n.3 *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1031-32 (10th Cir. 2022) (Lucero, J., dissenting) Judge Lucero's evaluation of the FSIS manual is not isolated: the Court's own sister court held the "USDA's Food Standards and Labeling Policy Book [] is not a federal regulation, but instead, as set forth in the Introduction, is a 'composite of policy and day-to-day labeling decision[s].'" *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 760 (W.D. Mo. 2015). Defendants rely on a policy manual that is not law.

In contrast to the arguments of Defendants, Plaintiffs' claims are rooted in law. It is telling that Defendants' entire argument rests on an interpretation of 21 U.S.C. § 607 that exonerates them, but their brief never quotes that statute in full, or its corresponding regulation:

> No article subject to this subchapter shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

21 U.S.C. § 607 (emphasis added).

> No product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, picture, design, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling.

9 C.F.R. § 317.8(a). Defendants' entire argument hinges on the ostensible approval granted by the FSIS manual, but regulatory approval is only one (1) of two (2) statutory preconditions FMIA

2

places on the sale of beef: that its labeling is (1) "not false or misleading **and** [(2) which are approved by the Secretary [.]" 21 U.S.C. § 607 (emphasis added). "This conjunctive language suggests that mere agency approval does not suffice to satisfy the statute. Rather, the Act contemplates the existence of—and indeed proscribes—labels that are both misleading and approved by the Secretary." *Thornton*, 28 F.4th 1016, 1031-32 (Lucero, J., dissenting). Whether FSIS approves or not, Defendants still may not use "labeling which is false or misleading." 21 U.S.C. § 607. This is consistent with FMIA's stated legislative goals:

> Meat and meat food products are an important source of the Nation's total supply of food. They are consumed throughout the Nation and the major portion thereof moves in interstate or foreign commerce. It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and **properly marked, labeled**, and packaged. Unwholesome, adulterated, or **misbranded meat** or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce, **are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged meat and meat food products, and result in sundry losses to livestock producers and processors of meat and meat food products, as well as injury to consumers.** The unwholesome, adulterated, mislabeled, or **deceptively packaged** articles can be sold at lower prices and compete unfairly with the wholesome, not adulterated, and properly labeled and packaged articles, to the detriment of consumers and the public generally.

21 U.S.C. § 602 (*emphasis added*). The problem here is the use of the "Product of the USA" label on beef that has been commingled with foreign beef. Nothing in FMIA allows the FSIS to override § 607's clear prohibition against marking and labeling commingled beef via an issued manual (especially one prompted by the lobbying of the Defendants)—not actual regulation. The FSIS manual does not and cannot overcome § 607's clear prohibition against selling mislabeled beef. Defendants seek to distract the Court from the deceptive nature of their conduct, precisely because fraudulent misrepresentation claims invoke the U.S. Supreme Court's decision in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S. Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion). It

is unsurprising that Defendants cannot, with a straight face, assert that their beef products are in fact all truthfully branded, packaged, and represented in commerce.  They know this is not true. Rather, their refuge is the specious and Orwellian contention that FSIS deems their false advertising to be truthful.

Likewise, Defendants cannot use the Dormant Commerce Clause in a manner that is inapposite to the abundantly clear stated intention of Congress. Defendants cannot reasonably expect anyone to credit the notion that USDA FSIS guidance and/or the Dormant Commerce Clause invalidate state law designed to prevent mega corporations from intentionally misrepresenting material facts about beef products, contrary to Congress's stated intent under the FMIA. Indeed, in this motion, Defendants seek legal cover for the proposition that they can sell "**misbranded meat [that is] injurious to the public welfare, destroy[s] markets for … properly labeled and packaged [beef], and result[s] in sundry losses to [beef] producers …, as well as injur[es] [the] consumers.**" 21 U.S.C. § 602 (*emphasis added*). This proposition should be a non-starter.  Defendants wish to rely on FSIS non-binding guidance to do exactly what Congress forbids—misbranding food products to the detriment of foreign and interstate commerce.

## ARGUMENT

### I.  <u>PLAINTIFF'S CLAIMS ARE NOT EXPRESSELY PREEMPTED BY THE FMIA</u>

#### A.  The Motion Is Procedurally Improper

Preemption is not properly before the Court. Upon filing a "pleading, written motion, or other paper drawing into question the constitutionality of a [] state statute," Federal Rule 5.1 required Defendants to file notice with the Court, and serve the notice on South Dakota. Fed. R. Civ. P. 5.1(a)(1), (2). When a state law "is preempted, [] its application is unconstitutional, under

4

the Supremacy Clause." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 388 (2000). *See also First American Title Co. of South Dakota v. South Dakota Land Title Ass'n*, 714 F.2d 1439, 1450 (8th Cir. 1983) ("the result of a successful preemption attack upon a state statute is that the statute is stricken down as unconstitutional under the Supremacy Clause," citing *Seagram & Sons v. Hostetter*, 384 U.S. 35, 45 (1966)).[1] Although Rule 5.1 applies to Defendants' motion, Defendants failed to comply with Rule 5.1's notice requirements.[2] The remedy for this failure is clear: the Court has found it is "not required to consider [a litigant's] claim because of his failure to" comply with Rule 5.1. *Marin v. Clear Recon Corp.*, No. 19-5057, 2021 WL 6691698, *2 (D.S.D. Dec. 1, 2021). The motion should be denied without prejudice until Defendants comply with Rule 5.1.

### B. Defendants Fail to Rebut the Presumption Against Preemption

Before actually evaluating preemption, this Court should consider the major premise of the motion which is notion that the FSIS manual is law. It is not: documents like "'agency manuals [] lack the force of law[.]'" *Wos*, 133 S. Ct. at 1402, 568 U.S. at 643 (quoting *Christensen*, 529 U.S.

---

[1]*See also Torres v. Precision Industries, Inc.*, 938 F.3d 752, 755 (6th Cir. 2019) ("courts hold preempted laws 'unconstitutional' under the Supremacy Clause," citing *Crosby*, 530 U.S. at 388, so "courts should not address a question of preemption if they can resolve the case on other grounds"); *Association of American Publishers, Inc. v. Frosh*, 607 F. Supp. 3d 614, 617 (D. Md. 2022) (state law was "unconstitutional under the Supremacy Clause because it [was] preempted by" federal law).

[2]*See ThermoLife Int'l LLC v. NeoGenis Labs Inc.*, No. 18-02980, 2020 WL 6395442, *16 (D. Ariz. Nov. 2, 2020) (applying Rule 5.1 to preemption argument, "as recent Supreme Court decisions seem to recognize, preemption claims are properly characterized as constitutional in nature," citing *Crosby*, 530 U.S. at 388); *von Kahle v. Cargill, Inc.*, No. 21-8532, 2022 WL 4096164, *1 (S.D.N.Y., 2022) ("courts have generally determined that providing notice is the better practice" with respect to "Rule 5.1's notice requirements [] to preemption challenges," cleaned up, citations omitted).

5

at 587). "[N]either an unreasoned statement in [an agency] manual nor allegedly longstanding agency practice can trump a formal regulation with the procedural history necessary to take on the force of law." *Central Laborers' Pension Fund v. Heinz*, 124 S. Ct. 2230, 2238, 541 U.S. 739, 748 (2004). The FSIS policy manual has never been subject to the notice and rule-making process required under the Administrative Procedures Act. *See* 5 U.S.C. § 553(b).

> The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'

*Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1204, 575 U.S. 92, 96–97 (U.S., 2015) (quoting *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995)). "A key feature of" such agency communications, released "without notice and comment" required by 5 U.S.C. § 553(b), "is that [] they are not supposed to 'have the force and effect of law'—or, otherwise said, to bind private parties." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2420 (2019) (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. at 1204, 575 U.S. at 96). "No binding of anyone occurs merely by the agency's say-so." *Id*. When an agency publication or communication is "not subjected to the rigors of notice and comment," it "is not entitled to substantial deference." *Saint Marys Hosp. of Rochester, Minnesota v. Leavitt*, 535 F.3d 802, 807 (8th Cir. 2008) (citations omitted, cleaned up).[3] At least with respect to Defendants' labeling practices at issue in this case, Defendants cannot rely on the FSIS manual as the law. *Id.* (where defendant relied on agency

---

[3]Agency statements that have "never been subject to the rigors of notice and comment [are] not be entitled to substantial deference." *Casey v. Coventry Health Care of Kansas, Inc.*, No. 08-00201, 2009 WL 1616636, *5 (W.D. Mo. June 9, 2009) (describing *King v. Morrison*, 231 F.3d 1094, 1097 (8th Cir. 2000)); *Barz v. Geneva Elevator Co.*, 12 F.Supp.2d 943, 955–56 (N.D.Iowa, 1998) (where agency interpretative rules "have not been subjected to 'notice-and-comment,'" they "do not have the force and effect of law," quoting *Shalala*, 514 U.S. at 99).

manual that did "not have the force and effect of law," defendant's "arguments based on its alleged reliance on the [manual] must fail"). *Cf. Kelly*, 81 F. Supp. 3d at 760 ("USDA's Food Standards and Labeling Policy Book [] is not a federal regulation").

Turning then, *arguendo*, to the unfounded assumption that the FSIS manual can constitute a form of express preemption (where a statute expressly states that it preempts certain areas of state law), a court must determine the scope of the preemption that Congress intended. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case"). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). When the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005). Preemption arguments are analyzed under rule 12(b)(1). *See Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007) (applying rule 12(b)(1) when reviewing motion to dismiss asserting preemption defense).

A court addressing express preemption must determine the scope of the preemption. That task entails scrutinizing the preempting words in light of two presumptions. First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Lohr*, 518 U.S. at 485 (citations omitted, internal quotation marks omitted). Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* at 485 (same).

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant,

however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Id*. at 486 (same).

When Congress legislates in a field traditionally occupied by the states (such as protecting consumers from deceit and fraud or enforcing restraint of trade), they "start with the assumption that the historic police powers of the States were not to be superseded by federal law and agency action] unless that was the clear and manifest purpose of Congress."[4] *Pacific Gas & Electric Company v. Energy Resources Comm'n,* 461 U.S. 190,206 (1983) *(quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218,230 (1947)). Put differently. "[p]reemption of state law by federal regulation is not favored 'in the absence of persuasive reasons - either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained." *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317 (1987) (*Quoting Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142 (1963)). Preemption "is not lightly to be presumed." *California Federal Savings and Loan Ass'n v. Guerra,* 479 U.S. 272, 272 (1987). "[S]tate and local regulation of health and safety matters can constitutionally coexist with  federal regulation [because] the regulation of health and safety matters is primarily and historically a matter of local concern." *Hillsborough County, FL v. Automated Medical Laboratories,* 471 U.S. 716. 719 (1985). This presumption against preemption applies here because preemption would displace the historic power of the states

---

[4]*R. E. Spriggs Co. v. Adolph Coors Co.*, 37 Cal. App. 3d 653, 664, 112 Cal. Rptr. 585, 592–93 (Ct. App. 1974) ("We perceive nothing inherent in the very nature of federal antitrust regulation which dictates that it be made the subject [] of exclusive federal regulation.")

to protect the health and welfare of their citizens. *See, e.g., Lohr,* 518 U.S. at 484-86; *Plumley v. Massachusetts*, 155 U.S. 461, 472, 15 S.Ct. 154, 39 L.Ed. 223 (1894) ("If there be any subject over which it would seem the states ought to have plenary control [] it is the protection of the people against fraud and deception in the sale of food products"). Because consumer protection law is a field traditionally regulated by the states, very compelling evidence of an intention to preempt is required here. *See, e.g., Envtl. Encapsulating Corp. v. City of New York,* 855 F.2d 48, 58 (2d Cir. 1988). The Supreme Court has cautioned:

> To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever an agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Hillsborough County Fla. v. Automated Med. Labs. Inc.,* 471 U.S. 707, 717 (1985). When express preemption language is susceptible to equally "plausible alternative reading[s]," the courts "have a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005). Without question, given that food safety and labeling are historically domains of state power, any ambiguity in the FMIA's preemption clause should be resolved against preemption. *See Plumley*, 155 U.S. at 472. While Defendants cling tightly to their reading of the FMIA and lower courts' holdings that ignore the very federalism Congress included for issues of misbranding in the FMIA preemption section of the law itself, a complete and correct reading must lead this Court to adopt an equally plausible alternative that cuts against preemption. *See Bates*, 544 U.S. at 449, 125 S.Ct. 1788.

The "presumption that the traditional police powers of states are not displaced by federal law" is based on "two practical reasons." *Chemical Specialties Manufacturers Association, Inc. v. Allenby.*, 958 F.2d 941, 943 (9th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). First, "Congress

has the power to make preemption clear in the first instance" by including statutory language that explicitly outlines the preemptive reach of any legislation. *Id.* Second, "if the Court erroneously finds preemption, the State can do nothing about it, while if the court errs in the other direction, Congress can correct the problem." *Id.* (citations omitted). *See also* Betsy J. Grey, *Make Congress Speak Clearly: Federal Preemption of State Tort Remedies,* 77 Boston Univ. Law Rev. 559,627 (1997). For this reason, the presumption against preemption can be overcome only by a showing of clear and manifest Congressional intent, which is the "ultimate touchstone" of any preemption analysis. *Cipollone,* 505 U.S. at 516. "The fact that Congress provided an express preemption clause supports a reasonable inference that it did not intend to preempt matters outside the clause, and thus, the task of courts 'is to identify the domain expressly pre-empted' by the clause." *Mulford v. Altria Group, Inc.*, 506 F. Supp. 2d 733, 749 (D.N.M. 2007) (citing *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001)).

Where (as here) the allegedly preemptive federal "regulatory" scheme does not itself provide any remedy for injured individuals, preemption would leave them without any state or federal remedy, the Supreme Court has ascribed preemptive intent to Congress only in the most compelling circumstances. *See English v. General Electric Co.,* 496 U.S. 72. 87-90 (1990); *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 251 (1984); *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers' Ins. Co.*, 514 U.S. 645, 654 (1995).[5] Under these standards, as

---

[5] In contrast, in *Bruesewitz v. Wyeth, LLC,* 562 U.S. 223 (2011), the Supreme Court held that the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa-11(c)(1), 300aa-13(a)(1)(A), preempted all design-defect claims that the plaintiffs seeking compensation brought against vaccine manufacturers for injury or death alleged to have resulted from certain vaccine side effects. *See id.* at 230. The statutory text at issue reads:

> No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the injury or death resulted from side effects that were

discussed more fully below, in this case involving intentional misrepresentation of material facts to the consumers, Defendants cannot make the showing that this case is preempted because the FMIA itself and its duly promulgated regulations clearly and unambiguously put Defendants conduct outside of the law, regardless of passive or permissive guidance that does not expressly prohibit misleading consumers or using an unlawful scheme to restrain trade.

## C.  Under Applicable Law, the FMIA does not preempt Plaintiff's Claims.

Given the backdrop of the meat packing industry in the late 1800s and early 1900s, it is hardly surprising that Congress intended to create a federalist regulatory scheme. In its statement of findings, Congress noted that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat ... [is] properly marked, labeled, and packaged," citing concerns about public health, small cattle farmers, and unfair competition. 21 U.S.C. § 602. This sweeping declaration reveals a clear intent to protect consumer safety and market integrity.

---

> unavoidable even though the vaccine was properly prepared and was accompanied by proper directions and warnings.

*Id*. (quoting 42 U.S.C. § 300aa-22(b)(1)). *Bruesewitz* observed that Congress passed this act to "stabilize the vaccine market and facilitate compensation." *Id*. at 228. The National Childhood Vaccine Injury Act provided for "[f]ast, informal adjudication," allowing "[c]laimants who show that a listed injury first manifested itself at the appropriate time are prima facie entitled to compensation." *Id*. Additionally,

> [a] claimant may also recover for unlisted side effects, and for listed side effects that occur at times other than those specified in the Table, but for those the claimant must prove causation. Unlike in tort suits, claimants under the Act are not required to show that the administered vaccine was defectively manufactured, labeled, or designed.

*Id*. at 228-229. *Bruesewitz* also noted that the statutory scheme had relatively favorable remedy provisions. *See id*. at 229. "The quid pro quo for this, designed to stabilize the vaccine market, was the provision of significant tort-liability protections for vaccine manufacturers," such as limiting the availability of punitive damages and expressly eliminating liability for a vaccine's unavoidable, adverse side effects. *Id*. *Bruesewitz* emphasized the use of the word "unavoidable" in reaching its conclusion that the statute preempted design defect claims resulting from unavoidable side effects. *Id*. at 231-232. *Bruesewitz* also found it persuasive that the statutory text directly mentioned other aspects of product liability law. *Id*. at 232-33.

11

But these efforts were not delegated to the federal government alone. Rather, the Act's provisions were meant to be enforced "by the Secretary [of Agriculture with] cooperation by the States and other jurisdictions." *Id*. (emphasis added). In fact, the FMIA contains multiple references to state and federal cooperation to protect consumers. *See, e.g.,* § 661 ("It is the policy of the Congress to protect the consuming public from meat ... that [is] adulterated or **misbranded** and to assist in efforts by State and other Government agencies to accomplish this objective," emphasis added). In fact, USDA's own regulations address the Defendants' conduct here as misbranding because the Act allows only the sale of beef with labels that "are not false or misleading **and** which are approved by the Secretary" of Agriculture. 21 U.S.C. § 607(d) (emphasis added). To effectuate statutory prohibition on misbranding or misleading labels, the USDA promulgated a regulation prohibiting any label that "conveys any impression or gives any false indication of origin." 9 C.F.R. § 317.8(a).

Defendants urge this Court to ignore clear unequivocally stated Congressional intent, the plain language of the statutes themselves, and the clear prohibition of a regulation adopted to effectuate the law, to find that a passive permissive guidance statement overrides not just federal law but the federalism associated to state laws designed to work in conjunction to protect the small agricultural producers like Plaintiffs here. In this case, Plaintiffs challenge Defendants' practice of importing cattle from other countries, oftentimes even slaughtering or processing them before they enter the United States and labeling the resulting meat a "Product of the U.S.A.," in a clear violation of both South Dakota law and the FMIA itself. Defendants wish for this Court to adopt a theory that Plaintiffs' claims are preempted by the FMIA because the FSIS preapproved defendants' labels and therefore they cannot be "false or misleading," pursuant to § 607(d). But, this is entirely backwards thinking, contrary to the plain text prohibition against misbranding that

is specifically provided for in the Act as an area of concurrent non-exclusive jurisdiction between the states and the federal government.

Defendants rely on a clause that reads: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any state or Territory ...." § 678 ("preemption clause"). Curiously, Defendants offer no explanation for how South Dakota's prohibition on using misleading labels to restrain train is different or in addition to the federal law and regulations prohibiting the same misbranding. **Defendants' argument rests entirely on the FSIS manual, which does not have the force of law.** Section 678's other language, which provides that states are free to "exercise concurrent jurisdiction" with the federal government "for the purpose of preventing the distribution ... [of] misbranded" meat products, so long as concurrent state regulation is "consistent with the requirements" of the FMIA, is equally important. *Id*. ("concurrent jurisdiction clause"). This language disavows the sort of preemption for which Defendants advocate.

Reading the whole statute (and not cherry picking as Defendants do), Plaintiffs' claims under state law are consistent with the FMIA and do not add to or change the requirements imposed by the Act. It becomes exceedingly clear that Plaintiffs' state law claims do not actually deviate from or add to FMIA labeling requirements. Rather, Plaintiffs are invoking South Dakota's concurrent jurisdiction, for which the Act itself expressly provides. The plain text of the FMIA demonstrates that FSIS approval (this is not offered as an acceptance that approval via a policy guidance document is actual approval of the labels or a foregone conclusion) of a label is not conclusive as to whether the label is unlawfully misleading. The Act allows the sale only of meat products with labels that "are not false or misleading and which are [pre]approved by the Secretary." § 607(d) (emphasis added). Inarguably, conjunctive language mandates that mere

agency approval (if it has actually occurred which is not an undisputed fact) does not suffice to satisfy the statute. Rather, the Act contemplates the existence of—and indeed proscribes—labels that are both misleading **and** approved by the Secretary. In this context, the most natural reading of § 678's concurrent jurisdiction clause is as an attempt to allow states to enforce the Act's prohibition against misleading labels when the agency declines to do so. This construction accords with the federalist language of the FMIA expressly included by Congress in the FMIA. Because food safety, consumer protection and anti-trust are a traditional regulatory domains of the states, the most plausible construction of the statute is the one disfavoring preemption and is therefore the correct one for this Court to adopt. *See Bates*, 544 U.S. at 449, 125 S.Ct. 1788; *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240.

As is clear from the Complaint, this case arises out of allegations that Defendants have knowingly made affirmative and voluntarily false statements in both labeling and advertising that certain of their beef products are "Products of the US" or similar impressions of actual domestic origin when in fact a significant portion of the beef they sell to retailers who sell to consumers under this false impression is of foreign origin. In *Cipollone,* the Supreme Court examined the preemption provision of the FCLAA, 15 U.S.C. *§* 1334(b), and it held that certain state law causes of action were preempted under the Act, while others were not. Importantly, however, the Court specifically held that "[f]raudulent-misrepresentation claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are **not** preempted by *§* 5(b)." (Emphasis added.) *Id.* at 528. With that case law in mind, the preemption provision of the FMIA being asserted in this matter provides as follows:

14

> Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or ***misbranded*** and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States. This chapter shall not preclude any State or Territory or the District of Columbia from making requirement[1] or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

21 U.S.C.A. § 678. (footnote omitted). This non-preemption provision expressly preserves a state's ability to "exercise concurrent jurisdiction" to prevent adulteration or misbranding. Plaintiff has alleged misbranding. For example, Defendants are alleged to be intentionally misrepresenting the country of origin of their products to gain a market advantage, intentionally misleading consumers and, contrary to the purposes of the federal scheme at issue, engaging in unfair competition by asserting that their products are something they are not. By comparison, the FCLAA preemption statute evaluated by the Supreme Court in *Cipollone* states:

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

15 U.S.C. §1334(b). With respect to whether state common law claims are preempted under this provision of the FCLAA, the *Cipollone* Court noted that "the common law is not of a piece," and while some state common law causes of action are preempted by the Labeling Act, others are not. *Id.* at 523.

Defendants are incorrect in asserting that the state causes of action in this case should be preempted, for two independent reasons. First, of the many cases the Defendants cite in favor of preemptive labeling authority, not one involves an agency's approval of a label that is outside of the "substance and scope" of the agency's statutory mandate—such as the importation status of

15

the meat. Notably, though it is not cited by Defendants, *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S. Ct. 1305, (1977) addressed the measuring and labeling of the weight of meat, a key concern of the Federal Meat Inspection Act (FMIA) since that Act's inception. On the other hand, the cases cited by Defendants in favor of preemption, including *Ranchers-Cattlemen Action Legal Fund v. United States Dep't of Agric.*, 2018 WL 2708747,  (E.D. Wash. June 5, 2018) fail to discuss a voluntary aspect of a label that is outside of the contents of the beef product, its measurement or that it came from a USDA FSIS inspected facility which address food safety and humane handling at the facility. Here, Plaintiffs' state a cause of action for a voluntarily addition of a false statement of fact with respect to the labels in order to compete unfairly in the market causing them sundry losses as expressly considered by the Congressional intent undergirding the law itself. To put it plainly, one of the state law duties Plaintiff alleges that Defendants violate includes a requirement is that Defendants must not misbrand in order to restrain trade. Such a duty is also expressly included in the FMIA. A restraint of trade lawsuit or a RICO lawsuit alleging misbranding and deceptive and false statements about food products in violation of the federal law itself as defined by USDA's own regulation, is therefore allowable under the FMIA's preemption provision and under case law analyzing the similar provision of the FCLAA.

Defendants contend that Plaintiffs' claims fall within the categories of items covered by the FMIA's purposes of food safety and humane handling inside USDA inspected facilities, even though Plaintiffs have not alleged that  Defendants  should have  to include any additional warnings concerning the food safety, the grading of the meat or notices regarding the way that the animal was handled inside of a FSIS regulated facility. Rather, Plaintiff has alleged that Defendants voluntarily (without requirement from FSIS) and deceitfully labeled while concealing the foreign

16

origin of their beef products. Likewise: here, if Defendants were found liable in this case, they would not necessarily have to change their labeling to add the honest country of origin. Rather, they could sell their imported beef of foreign origin without a label that outright lies about the Country of Origin of the Beef or gives the impression that the beef is of domestic origin. Moreover, while Defendants may not have added the actual country of origin on the label as it is presented to the consumer, they most certainly have admitted to misleading retailers as detailed in the declarations made to a federal district court under penalty of perjury, ECF Doc No 1-1, pgs 33-41. Ultimately, Consumers are deceived about what they are buying, and domestic cattle growers are subjected to unfair competition to their detriment. *See* ECF Doc. No. 1-1, pg 42 thru 1-3, pg 7.

Moreover, Defendants' argument that Plaintiffs' affirmative fraud claims are expressly preempted ignores the unambiguous holding in *Cipollone,* subsequently reaffirmed in *Lorillard* under which the Court must first determine whether the legal duty at issue is generally applicable or whether it specifically targets the industry and is based in this instance on food safety and humane handling of cattle for beef for human consumption. *See Cipollone,* 505 U.S. 524-529. Claims arising out of duties associated with the latter are preempted, while claims arising out of the former (upon which Plaintiffs' claims are based) are not.

As stated, like the intentional fraud claims in *Cipollone.* Plaintiffs' claims here "are predicated not on a duty [based upon labeling food quality or safety] but rather on a more general obligation - the duty not to deceive." *Cipollone,* 505 U.S. at 528-529. This is of course to say

nothing of the statutory and regulatory obligation not to mislead regarding the country of origin of their products.  The Supreme Court could not have been clearer in explaining that express preemption does not encompass the more general duty not to deceive or make fraudulent statements. Looking to the legislative history of the FCLAA, the Court in *Cipollone* noted that traditional police powers, such as the "regulation of deceptive advertising," were not to be displaced by the enactment of the preemption provision: "Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud." *Id.* at 529 and n.26. Here, Congress has offered zero indication that they wish to insulate Defendants and their cohorts from longstanding rules governing fraud. Defendants' have essentially re-trod the argument articulated by Justice Scalia in his dissent in *Cipollone,* which was rejected:

> Justice SCALIA contends that, ... as a matter of consistency. we should construe fraudulent misrepresentation claims *not* as based on a general duty not to deceive but rather as "based on smoking and health." ... ,[T]o analyze fraud claims at the lowest level of generality (as Justice SCALIA would have us do) would conflict both with the background presumption against pre-emption and with legislative history that plainly expresses an intent to preserve the "police regulations" of the States.

*Cipollone,* 505 U.S. at 529. n. 27. The position staked out by Defendants is therefore not the law— it is instead a version of what Justice Scalia propounded in dissent in *Cipollone*. Defendants would define down the restraint of trade claim by characterizing the duty in the narrowest terms (which would happen to fall under the preemption provision), instead of in accordance with the true duty at issue.

The overwhelming weight of the authorities interpreting *Cipollone* and *Lorillard*

18

acknowledge that affirmative fraud claims are not preempted. *See Johnson v. Brown & Williamson Tobacco Corp.,* 122 F. Supp. 2d 194, 203 (D. Mass. 2000) (no preemption of claims based on "intentional misrepresentations and false statements" in "advertising and promotional material"); *Penniston v. Brown & Williamson Tobacco Corp.*, No. 99-10628, 2000 WL 1585609 *5 (D. Mass. June 15, 2000) ("fraudulent misrepresentation claims based on false statements of material facts" not preempted); *In re Simon II Litigation,* 211 F.R.D. 86, 141-143 (E.D.N.Y. 2002)  (*Lorillard* reaffirmed *Cipollone* by emphasizing that "generally applicable obligations and laws were not preempted" and particularly "state laws prohibiting fraud" based on "'the duty not to deceive"); *Spain v. Brown & Williamson Tobacco Corp., 363* F.3d 1183, 1201-1202 (11th Cir. 2004)(claim that "manufacturers misrepresented and  fraudulently stated ...material  facts about  smoking and health ...not preempted, even to the, extent it arose in relation to advertising and promotion ...because such claims arc predicated . . on a duty ... not to deceive.")(internal quotations and citations omitted); *Hill v. R.J. Reynolds Tobacco Co.,* 44 F.Supp.2d 837 (W.D. Ky. 1999) ("'claims based on deception" such as "affirmative fraud ...  remain undisturbed by *Cipollone.'"): Appavo v. Philip Morris Inc.,* No. 122469/97, 1998 WL 440036 at •4 (N.Y. Sup. Ct. July 24, l998)("claims based on affirmative representations of fact, whether the alleged misrepresentations appear in advertisements or elsewhere, will escape preemption so long as they are based on a general duty not *to* deceive."').

Meat inspection and labeling as well as restraint of trade are traditional state concerns. Meat inspection only came under federal regulation in 1907, and the pre-emption sections of the FMIA did not go into effect until December 15, 1967, with the Wholesome Meat Act of 1967. Regarding food labeling specifically, the Third Circuit pointed out in *Holk v. Snapple Beverage Corp.,* 575 F.3d 329, (3d Cir. 2009) that food and beverage labeling "have traditionally fallen

19

within the province of state regulation." *Id.* at 334. Additionally, the court noted, "if there be any subject over which it would seem the states ought to have plenary control . . . it is the protection of the people against fraud and deception in the sale of food products." *Id.* at 334-335.

Applying the presumption against preemption of state laws in areas of traditional state concern, it becomes clear that the FMIA's labeling preemption does not apply to voluntary country of origin statements on labels. Even if the "substance and scope" of the FMIA includes misbranding (though expressly not to preemptive effect), (1) neither the substance nor the scope of the FMIA reaches where animals originated from before they are on a slaughterhouse's premises or processing facility; and (2) the labeling preemption clause of the FMIA was not intended by Congress to impact agriculture marketing and import/export concerns, which was already covered by the preemption statute that was passed in the Agricultural Marketing Act of 1946, 7 U.S.C. § 1621 et seq. Additionally, the purpose of the statute as a whole, the statutory framework, the language, and the way in which the regulatory scheme was designed to work all point clearly and definitively against preemption of state causes of action based on a duplicitous country of origin label, especially where the false label implicates then proximately causes false advertising by retailers.

Based on statutory framework and language alone, "[a] reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law," *Lohr* at 485, points conclusively away from labeling preemption, and certainly cuts against labeling preemption for labels that deal with the origination of the cattle for the beef products that compete unfairly in the market, causing sundry losses to livestock producers like the Plaintiffs here—losses that the FMIA seeks to prevent. On the latter point, the Supreme Court summed up the FMIA, noting at least five times that the FMIA applies to activities on

20

slaughterhouse grounds and by slaughterhouses (i.e., not the country of origin of the cattle in the slaughterhouse or the boxes of beef arriving at a USDA inspected processing facility). *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 466, 132 S. Ct. 965, 974, 181 L. Ed. 2d 950 (2012).

The second and independent reason state claims against fraudulent origination labels on meat are not preempted is that they require exactly the same thing as is required by federal law— veracity. The FMIA prohibits "any act . . . which is intended to cause or has the effect of causing [meat] to be adulterated or misbranded." 21 U.S.C.A. § 610(d). The Act provides examples of "misbranded," with the first example defining it as "false or misleading in any particular." *Id*. at § 601(n)(1). Thus, any consumer action that is based on a "false or misleading" label would dovetail with the Act. There is FMIA jurisprudence that supports the presumption against preemption in this regard. In *Mario's Butcher Shop & Food Center., Inc. v. Armour & Co.*, the North Federal District Court of Illinois held that state consumer fraud and deceptive practices actions could be brought by the plaintiff if he based them on violations of FMIA's labeling requirements. *Id., 574 F. Supp. 653, 656 (N.D. Ill. 1983). In that case, a butcher sued three meat companies for consumer fraud and deceptive practices under state law, claiming that they had lied on the labels of their meat containers, stamping the containers "10 pounds" when in fact they contained less. *Id* at 654. The meat companies claimed federal preemption under the FMIA. *Id.* The court ruled that as long as the butcher's state law claims were based on a violation of the FMIA's requirements regarding weight declarations, his causes of action could continue, because they would not require anything in addition to or different from federal law. *Id* at 656 Likewise here, because the FMIA prohibits "false and misleading" labels, state causes of action based on duplicitous or false origination claims would be allowed. *See e.g. Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330, 128 S. Ct. 999, 1011, 169 L. Ed. 2d 892 (2008) ("State requirements are pre-empted... only to the extent that they are

'different from, or in addition to' the requirements imposed by federal law.") And while *Mario's* is forty years old, more recent Supreme Court precedent in the non-FMIA realm supports the analysis. In *Bates v. Dow Agrosciences LLC*, Dow argued that the Federal Insecticide, Fungicide, & Rodenticide Act (FIFRA) preempted state law claims for damages. The Court looked at the preemption clause of the FIFRA, which—just like the FMIA's preemption clause—preempted state law "in addition to or different from" FIFRA requirements. 544 U.S. at 431. The Court ruled that "a state-law labeling requirement is not pre-empted . . . if it is equivalent to, and fully consistent with, FIFRA." *Id.* at 447. And to be clear, it is only the requirements that must be the same—the precise words do not. The *Bates* court explained: "To survive pre-emption, the state-law requirement need not be phrased in the identical language as its corresponding FIFRA requirement; indeed, it would be surprising if a common-law requirement used the same phraseology." *Id.* at 454.

In explaining why state law would be retained where it aligned with federal law, the Supreme Court stressed that an overreach attempting to vacate state law that is not in conflict with federal law would not offer "any plausible alternative interpretation of 'in addition to or different from' that would give that phrase meaning." *Id*. at 448. The Court discussed Dow's argument to the contrary, in terms that would apply perfectly to any attempt to challenge state law claims based on false humane labels. It noted that they appear to favor reading ["in addition to or different from"] out of the statute, which would leave the following: "Such State shall not impose or continue in effect any requirements for labeling or packaging." This amputated version . . . would no doubt have clearly and succinctly commanded the preemption of *all* state requirements concerning labeling. That Congress added [the phrase "in addition to or different from"] is evidence of its intent to draw a distinction between state labeling requirements that are preempted

22

and those that are not. *Id*. at 448-49 (emphasis in original). The Court also noted that allowing state causes of action for violation of federal law will in no way hinder federal action; in fact, doing so "would seem to aid, rather than hinder" federal law. *Id*. at 450-51. That is especially true here, where meat inspection and prohibiting restraint of trade is a duty shared by states and the federal government, and where the FMIA explicitly anticipates and welcomes state action in the area. Specifically, states are encouraged to "exercise concurrent jurisdiction with the Secretary over articles required to be inspected . . . for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded." 21 U.S.C. § 678.

## II.     PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE DORMANT COMMERCE CLAUSE

Defendants contend that the claim asserted in this lawsuit, if permitted to go forward, run afoul of the negative implications that courts have read into Congress' power to regulate interstate commerce. The argument depends heavily on the Defendants' position that federal law preempts the claims. As discussed above, the preemption argument is meritless. Without preemption, the Dormant-Commerce arguments fall flat. Notably, rather than economic protectionism, the state-law causes of action Plaintiffs assert are legitimate, generally applicable and non-discriminatory livestock producer protection measures designed to discourage anti-competitive restrains on trade on the part of businesses—even large and powerful businesses like the meat companies in this case.

### A.  The Motion Is Procedurally Improper

Again, the question preemption is not properly before the Court. Again, Rule 5.1 required Defendants to file notice with the Court, and serve notice on South Dakota, with respect to its dormant Commerce Clause arguments. *See* Fed. R. Civ. P. 5.1(a)(1), (2). *Cf. Lazar v. Kroncke*,

23

862 F.3d 1186, 1202 (9th Cir. 2017) (affirming ruling that plaintiff's failure to comply with Rule 5.1 waived "dormant Commerce Clause [] challenge" to state property law, where the plaintiff's Rule 5.1 notice "specified only the Contracts Clause and conflict preemption as grounds for her constitutional challenge"). The Motion should be denied without prejudice until Defendants comply with Rule 5.1. *See Marin*, 2021 WL 6691698, at *2.

### B.  Legal Standards for Dormant Commerce Clause

"The focus of a dormant Commerce Clause challenge is whether a state law improperly interferes with interstate commerce. The primary concern is economic protectionism." *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1135 (10th Cir. 2016).  Summarizing the Supreme Court of the United States' precedents regarding Dormant Commerce inquiries, the Tenth Circuit has explained:

> As to matters within the scope of the Commerce Clause power, Congress may choose to regulate, thereby preempting the states from doing so, *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96–98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or to authorize the states to regulate, *see In re Rahrer*, 140 U.S. 545, 555–56, 11 S.Ct. 865, 35 L.Ed. 572 (1891); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429–31, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946).

*Direct Mktg. Ass'n v. Brohl*, 814 F.3d at 1135. Alternatively, when Congress is silent, "The crucial inquiry, therefore, must be directed to determining whether [a state law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Furthermore, the Supreme Court distinguishes between state regulation that discriminates against interstate commerce and non-discriminatory regulation that, nevertheless, burdens interstate commerce. Courts "require[] that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.' " *Or. Waste*

24

*Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 101, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).  On the other hand, "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."
*Pike v. Bruce Church, Inc*., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Supreme Court has noted:

> State laws frequently survive this *Pike* scrutiny, *see, e.g., United Haulers Assn., Inc. v. Oneida–Herkimer Solid Waste Management Authority*, 550 U.S. 330, 346 – 347, 127 S.Ct. 1786, 1797–98, 167 L.Ed.2d 655 (2007) (plurality opinion); *Northwest Central Pipeline Corp. v. State Corporation Comm'n of Kan*., 489 U.S. 493, 525–526, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989); *Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 472–474, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339, 128 S. Ct. 1801, 1808–09, 170 L. Ed. 2d 685 (2008).

## C. Plaintiffs' Lawsuit Invokes Laws and Rights Legitimately Aimed at Protecting the Nation's Livestock Producers and Which Do Not Unduly Burden Interstate Commerce.

The focus of this case is on the propriety of certain state-law causes of action under common law and/or under state statutes designed to business from anti-competitive restraints on trade by other businesses in the marketplace. These causes of action are not rooted in any laws that attempt to discriminate against interstate commerce or even foreign commerce for that matter. The question of pre-emption is discussed in detail above. Thus, from the standpoint of the commerce clause, the issue is whether restraint of trade laws that create liability for misbranding of food products, places an undue burden on interstate commerce. They do not.

Plaintiffs have demonstrated above that their restraint of trade claim and RICO claims are

25

rooted in the duty not to deceive are not preempted. *See, e.g.*, *Mulford v. Altria Grp., Inc.*, 506 F. Supp. 2d at 750 ("The Court therefore concludes that Plaintiffs' UPA claim based on the theory of false representation rests on a duty not to deceive and not on a duty "based on smoking and health," and thus, is not expressly preempted by the FCLAA."). This legal principle lays bare a glaring defect in Defendants' Commerce Clause argument: Neither Congress nor federal courts have viewed themselves as being in the business of requiring states to allow deceptive trade practices or anti-competitive trade practices. Indeed, it is a perverse argument to contend that prohibiting deceptive trade practices interferes with interstate or foreign commerce.  Of course, Congress has taken some action with respect to the labeling of certain meat products, but Congress has not attempted to immunize meat packagers from liability for making knowingly deceptive claims about their products. This would include false claims about the origins of their products. In summary, the dormant Commerce Clause argument is weak at best and should be rejected. The dormant implications of the Commerce Clause cannot reasonably be read to mean that states cannot burden legitimate interstate commerce or foreign commerce by prohibiting or allowing civil liability against deceptive, fraudulent, and anti-competitive trade practices.

### D.  Defendants Arguments Regarding Foreign Commerce are a Red Herring

Defendants' argument regarding the WTO do not hold water and instead rest on a red herring.  Defendants suggest that if a decision allowing Plaintiffs' claims to move forward runs afoul of a WTO ruling, then such a decision places a beef packer in the untenable position of being unable to comply with both United States law and international agreements to which the United States is a party.  Of course, no such conflict exists here.  The WTO does not have a legitimate place in determining the proper relationship between state and federal laws in the United States. More to the point, the WTO has not said that states within the United States are precluded from

26

proscribing deceptive and false branding of imported beef products. In reality, the WTO ruling finds that *requiring* a country of origin label for beef and pork (information which American consumers have articulated is very important to them to know, *see* Exhibit 5 to the Complaint) was discriminatory against foreign meat because purchasers were less likely to buy it. The critical distinction is obvious. The WTO requiring that the USDA *not* require candid labels about country of origin is not the same thing as an attempt by the WTO to require the USDA to allow deceitful labels misrepresenting origin. Quite simply, whether under federal or state law, or in harmony with the WTO ruling, beef processors may not be required to place a country of origin label on beef products, but if they choose to place one, it must not be deceitful.

The arguments the Defendants propound here was rejected by District of New Mexico Judge James O. Browning wherein he persuasively stated:

> In 2016, Congress addressed the consternation that country-of-origin labeling requirements caused other countries by withdrawing the requirement that beef products be labeled with a country of origin. *See* 7 U.S.C. §§ 1638, 1638a; Pub. L. No. 114-113, 759, 129 Stat. 2242, 2284-85 (2016). Because Congress withdrew this requirement, and because advertising beef as "U.S.D.A. CHOICE/Produced in the USA," or with the USDA official grade shield, is permissive and not mandatory, it is possible for the Defendants to comply with State law without affecting international trade agreements. The Defendants could comply, for example, by removing from their advertisements misleading promotional stickers and graphics which contain wording or symbols suggesting a country of origin for beef products. *See Animal Legal Def. Fund v. Hormel Foods Corp.*, No. 19-CV-0397 at *38-39. It is difficult to see how, if the Defendants can no longer advertise imported beef products with promotional stickers or advertising graphics indicating that those products have a geographic origin in the United States, this would upend WTO rulings.

> To the extent that Thornton requests that the Defendants refrain from making false or misleading statements about those products by removing the promotional stickers and graphics from advertisements for beef whose origin they cannot confirm is domestic, her claims do not run foul of the Dormant Commerce Clause, because ensuring that advertisements are truthful and not misleading is a legitimate public interest, which will be upheld " 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *South*

27

*Dakota v. Wayfair, Inc*., —— U.S. ——, 138 S. Ct. 2080, 2091, 201 L.Ed.2d 403
(2018)(quoting *Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d
174 (1970)). The Defendants do not demonstrate that refraining from advertising
beef products with the graphics or promotional stickers to which Thornton objects
is an excessive burden in light of the local State interest in truthful advertising.

*Thornton v. Kroger Co.*, 2022 WL 488932, at *104–05 (D.N.M. Feb. 17, 2022).

And, again here, Defendants seek to ignore the clear authorization of Congress for concurrent jurisdiction of state laws addressing misbranding of meat which the Supreme Court precedent holds dooms their arguments about interference with foreign commerce. Congress' authorization certainly does not run afoul of any trade agreements to which the United States is a party. It is well-established that state laws that might otherwise be barred by the dormant Commerce Clause are permissible if sanctioned by Congress. *See Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 434, 66 S.Ct. 1142, 1157, 90 L.Ed. 1342 (1946). The analysis created under the Dormant Commerce Clause, whether domestic or foreign, applies only to cases where the Federal Government has not affirmatively acted. *See Wardair Canada v. Florida Dept. of Revenue,* 477 U.S. 1, 5, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 (1986).

### III. PLAINTIFFS' STATE LAW CLAIMS ARE MORE THAN PLAUSIBLE AND PLED WITH ENOUGH SPECIFICITY TO SATISFY THE PLEADING STANDARDS OF *IQBAL* AND *TWOMBLY*.

"'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556, 127 S.Ct. 1955)." *Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1206 (D.N.M. 2019). Here, Plaintiff has pled:

12. Defendants' misrepresentations about beef that is a "product of the U.S." prompts consumers to buy beef products with more confidence than they might

28

otherwise have, and to pay more for them than they otherwise would and allows Defendants to pay Plaintiffs, the members of the Class and the members of the sub-class significantly less for their cattle that actually originate in the United States.

13. Plaintiffs Taylor and Baker, like most domestic producers ranch in an environmentally responsible manner with concern for food safety standards and humane animal handling standards and expects that consumers will rely on upon those actions in making a decision on purchasing beef. Reasonable consumers who see Defendants' representations about beef that is a "Product of the U.S.," did not expect the Products to be derived from non-domestic cattle. Reasonable consumers purchased the Products believing that they were supporting American producers, like Plaintiffs, by purchasing Products labeled "Product of the U.S."

14. By deceiving consumers about the true origin of the products, Defendants are able to sell a greater volume of the products, to produce cheaper products in other Countries, and to take away market share from competitors as well as pay lower prices to domestic producers, like Plaintiffs, thereby increasing their own sales and profits.

ECF Doc. No. 1-1, pg. 26. Thus, Plaintiffs specifically allege that Defendants make the fraudulent representation to wholesalers and retailers who carry the intentional misrepresentation to the consumers in both labeling and mailed advertisements in reliance on Defendants, which results in producers like Plaintiffs received less for their cattle if than if they were allowed to compete fairly in the marketplace with honestly labeled beef or at least not dishonestly labeled beef.  Plaintiff's Complaint, thus, gives fair notice of the plausible claim as required by the standards set out in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly;* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The level of deception and the amount of reliance by wholesalers and retailers placed on the packers in control of the country of origin information for impact on the market that restrain trade is a factual determination that ultimately must be determined by the fact finder in the case, once the Court determines that the claim is discernable and plausible the Court should infer the facts in favor of Plaintiff and avoid dismissing the case at this juncture. The Defendants have openly admitted via declarations, *see*

ECF Doc No 1-1, pgs 33-41, that they are in violation of FMIA's prohibitions on misbranding and USDA's very regulation on misbranding by misrepresenting the country of origin of meat which is enough to trigger liability. Ultimately, Defendants seek to have this Court pass judgment on the underlying, ultimate factual questions of Plaintiff (while seeking to deny Plaintiff the same) and find that no set of facts or law would support Plaintiff's claims. Such determination at this juncture, however, "would require a ruling on the *ultimate factual questions . . .* which would be impermissible" as Circuit Courts have cautioned against. *Ames v. Vavreck*, 356 F. Supp. 931, 936–37 (D. Minn. 1973); *See, e. g., Guedry v. Ford*, 431 F.2d 660 (5th Cir. 1970); *Hilliard v. Williams*, 465 F.2d 1212 (6th Cir. 1972).

Defendants' other arguments fall flat for similar reasons. First, the argument that Plaintiff does not allege that labels from Defendants that intentionally misrepresent that the beef products they sell to retailers and wholesalers (who in turn continuing the mislabeling and then falsely advertise in reliance on that false information) is of domestic origin under the consumers understanding of those terms is not deceptive is implausible. That is the noticeably clear and explicit claim made throughout the entire complaint giving rise to each cause of action alleged very plausibly and giving more than sufficient notice under *Iqbal* and *Twombly*. Second, discussed more fully below, the Defendants ask this Court to assume contrary to the actual plain language of FMIA and USDA's regulation defining and prohibiting making misleading statements about foreign source of beef.

**A. Plaintiffs Have Plausibly Stated That Defendants Use of False or Misleading Labels on Foreign Beef Restraints the Plaintiffs' Ability to Compete Fairly in the Market Causing an Antitrust Injury**

**1. Plaintiffs Injuries are Sundry Losses Caused by Defendants Anti-Competitive Sale of Foreign Beef Under a Misleading Label That <u>Does Not</u> Comply with Federal**

**Statutory and Regulatory Requirements**

The base and fundamentally flawed premise that Defendants relied upon for their argument for why their deceptive and anti-competitive conduct is not an antitrust injury is that their use of passive guidance statement makes their actions lawful, but as discussed throughout this brief, it plainly is not. Guidance statements that go through none of the rigors legislation or regulatory adoption's due process have never been held by any Court to override clearly stated Congressional intent, plain statutory language or lawfully adopted agency regulations.  The Defendants know this, yet, they ask this Court to stumble down the same rabbit hole that the District Court in New Mexico and the majority in the Tenth Circuit (despite an extremely persuasive dissent from Judge Lucero) did in the *Thornton* cases. This Court should not simply agree with the premise that Defendants actions are lawful any more than it should ignore the conjunctive language and concurrent jurisdiction supporting the existence of state law remedies that Congress expressly included in the FMIA.  Specifically, Defendants audaciously announce that "Defendants do not control or define what beef products may bear the "Products of USA" label-the federal government does." Motion at 18.  But, that is simply not true, USDA does define in 9 C.F.R. § 317.8(a) that the labels being used by Defendants here are misleading and are prohibited.  Defendants choose to place labels upon their beef products that they know to be false.  No federal law requires them to do this.  Moreover, USDA does not control what beef products bear the label.  That decision belongs to the packers who take the voluntary action to lie about the products' origins. FSIS simply does not have the authority to conclude through a guidance document that the plain language of an adopted regulation simply does not mean anything at all.  This is the grand hoax that the Plaintiffs allege that the Defendants colluded to accomplish, to lobby USDA FSIS to issue a non-binding policy document that violates the FMIA and USDA's regulations so that they could

31

intentionally deceive consumers, causing billions of dollars of losses to producers while inflating their own ill-gotten profits.

**2. Being a Rancher or Farmer Raising Beef Imparts No Knowledge of the Packers Labeling Practices Once the Cattle Leave the Ranch or Farm**

The Defendants make sweeping conclusory allegations about the knowledge across distinct sectors of the beef supply chain by obscuring the reality of what happens in the industry. Certainly, Defendants understand that the cattle growers that raised the cattle and supply the large companies processing over 80% of the beef consumed by Americans (Defendants) are not privy to the processing inside of those plants, the shipping yards (on the borders) or the docks accepting the cattle and frozen beef off of ships from other countries. Rather than recognize this reality, Defendants offer a conclusory fact (contrary to the allegation that this Court must take as true at this stage) that ranchers with experience like the Plaintiffs here must have been "[]aware of Defendants' labeling in 2016 or could not have discovered the alleged misleading labeling and its effects by the 'exercise of diligence.'" Motion at 19. This threadbare conclusory argument that asks this Court to assume a fact contrary the allegations of the Complaint is simply wrong and without more this argument is plainly doomed.

Moreover, even if it enjoyed factual support, Defendants' conclusory argument has been dispensed with by the Supreme Court stating that:

> Antitrust law provides that, in the case of a "continuing violation," say, a price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Klehr v. A.O. Smith Corp.*, 117 S.Ct. 1984, 1990, 521 U.S. 179, 189 (U.S.,1997) (applying

"continuing violation" accrual rules from antitrust to RICO causes of action). *Cf. In re Pre–Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1068 (8th Cir. 2017) ("continuing violation" rule from *Klehr* controls in antitrust cases).

### B. Plaintiffs Plausibly State a Claim for Unjust Enrichment

There is no express contract between Plaintiffs and Defendants, despite the Defendant's statement to the contrary.   No express or implied contract between the parties is pleaded. Defendants, while acknowledging that South Dakota bars claims for unjust enrichment where there is a contract *between the parties*, attempts to have this Court stretch the law from one case from the Eastern District of Arkansas to apply Arkansas law to this case.   And while both Arkansas and South Dakota are both in the Eighth Circuit, Arkansas law does not inform the analysis here. Instead, Plaintiffs have clearly alleged under South Dakota law that in this case "'[u]njust enrichment occur[ed] when [Plaintiff] convey[ed] [the] of benefit [of receiving less for their domestically produced cattle while Defendants received equal prices for their less desirable imported beef and cattle from consumers based upon the misleading representations regarding the origin of the foreign beef] upon [the Defendants] who accept[ed] [] that benefit, making it inequitable to retain that benefit without paying.'" *Sancom, Inc. v. Qwest Communications Corp.*, 643 F. Supp. 2d 1117, 1125 (D.S.D. June 19, 2009) (quoting *Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003)).

### IV.   DEFENDANTS KNOWING VIOLATION OF FEDERAL LAW TO DEFRAUD CONSUMERS AND COMPETE UNFAIRLY IN A SCHEME TO PROFIT FROM THAT ILLEGAL ACTIVITY USING WIRES IS ACTIONABLE AND SUFFICIENTLY PLEADED

### A. Defendants Overstate the Approval of the Statutorily Prohibited Labels and Understate Their Violation of the Law

33

As noted above, Defendants continue to hang their hat on the notion that an agency statement about voluntary activity in a guidance document that is directly contrary to the FMIA and the agency's own regulation constitutes *approval* of a knowing false statement of origin. But that argument presupposes that a guidance document that is contrary to the law can be interpreted to grant approval to violate the law and the regulations. In fact, the Defendants' title to this section betrays this fallacy, "Defendants' ***Lawful*** Use of Government-Approved Labeling Is Not A Basis for a Civil RICO Claim." Memo at 22 (emphasis added).  Defendants' use of a misleading or outright false label misbranding beef as a product of this Country is not lawful because it clearly violates the law. *See*  21 U.S.C.A. § 607 "No article subject to this subchapter shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.")  That the wording of the label is approved by a federal agency does not mean that the label can be applied to something in a misleading or false manner.  Even if Defendants can successfully argue (which they cannot) that the Secretary approved these labels, the labels are still misleading contrary to 9 C.F.R. § 317.8(a). ("No product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, picture, design, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling.") A label on chilled or frozen beef imported in a box from Brazil labeled "Product of the USA" does not cease to be misleading

34

merely because a guidance document allows the misleading statement to be added voluntarily once the beef is put into a new box to be shipped to the retailer.

Moreover, because Defendants actions are <u>not</u> lawful, Plaintiffs have adequately pleaded to demonstrate that they are not attempting to create a private cause of action under the FMIA because they sufficiently pleaded a RICO cause of action that is well established under the law. The Supreme Court has been clear that a competitor of an enterprise that conducts its business through a pattern of racketeering activity to defraud consumers and thereby enhance its profits or perpetuate its economic power can bring civil RICO actions alleging injury by reason of the enhanced commercial position the enterprise has obtained from its unlawful acts. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454, 126 S. Ct. 1991, 1995, 164 L. Ed. 2d 720 (2006). Specifically, Plaintiffs here have alleged that Defendants have engaged in a pattern of racketeering using wires or mail to collect their ill-gotten gains derived from competing unfairly in the market by misleading consumers proximately causing Plaintiffs to be paid less for their cattle on the market than they would receive if consumers were told the truth about what they were purchasing.

Specifically, 18 U.S.C.A. § 1962 (c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." That is precisely and clearly, what the Plaintiffs allege that the Defendants have combined to do here under the false premise that their actions are somehow now lawful and not deceitful because a guidance document purports to authorize a violation of law and regulations. Instead of a private right action under the FMIA, here, Plaintiffs have adequately and plausibly pleaded that Plaintiffs base their RICO claims on Defendants' "numerous and repeated violations of federal mail and

wire fraud statutes, which prohibit the use of an interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud American consumers in order to profit from unfair competition in the market through the use of cheaper foreign beef, in violation of 18 U.S.C. §§ 1341 and 1343. The crimes of wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341 include two essential elements: (1) the existence of a scheme to defraud and (2) the use of wire communication or the mails in furtherance of that scheme as pleaded by the Plaintiff here. *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). Plaintiffs have alleged that Defendants engaged in a collective effort as part of a specific intent to engage in a "scheme to defraud." *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (citing *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001)). "And the element 'to defraud' has 'the common understanding of wronging one in his property rights by dishonest methods or schemes and usually signify[ing] the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Id.* at 477-78 (quoting *Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)). "It is not necessary that use of mails or wire facilities be an essential element in the scheme." *Choimbol v. Fairfield Resorts*, 428 F. Supp. 2d 437, 443 (E.D. Va. 2006). Indeed, a plaintiff need only allege that the mailing or transmittal of information constituted "'step[s] in [the] plot,' and were incident to the essential part of the scheme." *Id.* at 444 (quoting *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916)).

Intentionally misleading consumer into purchasing foreign beef that they otherwise would not be induced to buy when given the honest choice to purchase actual American beef is a scheme of fraud that each of these Defendants has admitted to engaging.  As with the rest of their motion, getting away with the fraud turns upon the ratification of that unlawful deception by virtue of a guidance statement overriding the clear unambiguous language of the FMIA.

36

**B. Petitioning for Guidance to Voluntarily Violate Federal Law and Regulations is Not Legitimate Speech or Petitioning Protected by the First Amendment**

Tellingly, Defendants state that "[c]ourts dismiss civil RICO claims premised on defendants' **lawful** exercise of their First Amendment rights under this doctrine." Memo at 24 (emphasis added). That is true, but it again supposes contrary to the allegations of the Complaint taken as true for the purpose of a 12(b)(6) that Defendants' First Amendment activity was lawful or legitimate, instead of a sham for purposes of unfair competition. Specifically, Plaintiffs have clearly pleaded that Defendants lobbying of FSIS to issue a guidance document is objectively baseless because the guidance document cannot override the prohibitions of the FMIA itself or the regulations duly adopted to implement the FMIA. And, if based upon the facts as alleged by Plaintiffs, the Defendants' efforts to lobby an executive agency is objectively baseless as it facially appears then Defendants petitioning and speech activities in this regard fall into recognized exception to the *Noerr-Pennington* Doctrine.  Specifically, in this regard, the Fifth Circuit held that:

> The "sham" exception involves attempts to influence public officials for the sole purpose of expense or delay. *See Omni Outdoor Advertising, Inc.,* 499 U.S. at 380, 111 S.Ct. 1344. **The exception applies to defendants who use the process *862 as an anticompetitive weapon**, rather than those who genuinely seek to achieve an intended result. *See id.* at 381, 111 S.Ct. 1344. The evidence must show that a defendant's lobbying activities were "objectively baseless" for the "sham" exception to apply. *Professional Real Estate Investors v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *Brown & Root, Inc. v. Louisiana State AFL–CIO,* 10 F.3d 316, 324 (5th Cir.1994). Lobbying activity is objectively baseless if a reasonable private citizen could not expect to secure favorable government action.

*Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861–62 (5th Cir. 2000)(emphasis added). Here despite the fact that the Packer lobby was actually able to convince FSIS to act contrary to the law, no reasonable private citizen could expect that they would be able to convince a federal agency to

issue a guidance document that purports to override clearly stated Congressional Intent and clear prohibitions in the FMIA against misbranding or that violated USDA regulations regarding misrepresenting country of origin of beef products.

C. **Again, Petitioners Dishonestly Overstate What Information a Typical Rancher or Farmer Would Have Access to Reasonably Discover the Deceit of the Packers in Their Labeling of Foreign Beef**

Adding the colorful term of "inconceivable" for the second round of misconstruing how privy a rancher or farmer is to the process of processing and labeling the beef once it leaves the ranch or farm and is distributed to retailers doesn't make the Defendants allegation of this material fact any more persuasive. It remains a request to have this Court construe facts contrary to the pleading. Plaintiffs simply did not know and could not have known that the Defendants were supplying beef to retailers under a false and deceptive label, because they have no involvement or access to that part of the beef supply chain. Again, as noted above the Court should apply the Supreme Courts holding in *Klehr*, instead of some unfounded theory that experienced ranchers must know what labels the packers are putting on meat that is shipped to the retailers that they would have no reason to ever see.

D. **Plaintiffs RICO is Adequately and Plausibly Pleaded**

Plaintiffs have adequately and plausibly pleaded that the Defendants engaged in a collective scheme to deceive consumers into purchasing the cheaper foreign beef under a false label. Plaintiff's detailed complaint provides pictures, declarations admitting to the artifice, dates when Defendants engaged in the scheme, how they effectuated the fraud, allegations of collective efforts to engage in unlawful actions to capitalize on the misrepresentations. This means that Plaintiffs' detailed allegations of how the Defendants have carried out this defrauding of the

38

American consumer and the anticompetitive destruction of the prices received by America's farmers and ranchers for their domestically produced cattle are not just conclusory pleaded. It means that Plaintiffs have satisfied the Eighth Circuits holding in *Crest Const. II, Inc. v. Doe*, 660 F.3d 346 (8th Cir.2011).

## V.    PLAINTIFF'S CLAIMS SHOULD NOT BE DISMISSED UNDER THE PRIMARY JURISDICTION DOCTRINE

As the Tenth Circuit has explained:

> Even where a court has subject matter jurisdiction over a claim, courts have discretion to refer an issue or issues to an administrative agency. *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir.1989). The doctrine of primary jurisdiction is "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).

*TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238 (10th Cir. 2007). The purpose of the doctrine is to "allow agencies to render opinions on issues underlying and related to the cause of action." *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1179 (10th Cir.2005). In the present case "[t]he district court is not required to defer factual issues to an agency under the doctrine of primary jurisdiction if those factual issues are of the sort that the court routinely considers" and that is exactly what is presented here. *TON Services, Inc. v. Qwest Corp.*, 493 F.3d 1225, 1241 (10th Cir. 2007). This case does not warrant a stay under the primary jurisdiction doctrine, much less dismissal. Congress has spoken about the issue, and has expressly preserved state law remedies, and there is no need for this matter to be referred to an executive agency.

Defendants' argument for dismissal based on the primary jurisdiction of USDA FSIS is also fatally flawed. Critically, none of the four cited factors[6] counsel in favor of deference to the agency's expertise here.

Factor 1. While Defendants insist that, facially, the first factor clearly applies, in reality it does not. While Defendants are engaged in beef processing subject to USDA FSIS's expertise on its regulations and technical requirements, this case does not require expertise on beef processing or whether or not the technical claims on a label are correct. This is a case about an admitted outright lie presented to the consumers regarding the origins of beef products sold to and through retailers. This Court is more than capable of determining the honesty of statements of fact about products made to the public. It does not require any agency expertise. Moreover, this "doctrine is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit. Instead, it is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008) (internal quotation marks and citation omitted). Perhaps even more importantly, Country of Origin labeling has been traditionally administered by USDA Agricultural Marketing Service ("AMS") under the Agricultural Marketing Act ("AMA"), 7 U.S.C. § 1621 et seq., enacted in 1946, not by USDA FSIS under the FMIA. That is of course, until Congress removed beef and pork from the regulation of AMS by amending the AMA in the 2016 Consolidated Appropriations Act, Pub. L. No. 114-113, 129 Stat. 2242 (2015); 7 U.S.C. §§ 1638,

---

[6] *See Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1349-50 (D.N.M. 1995)

1638a. So, a legitimate question exists as to whether or not USDA has any jurisdiction, much less technical authority over Country of Origin labeling for beef and pork products. Nothing in the reality surrounding country of origin labeling for beef suggests that this Court should defer to any agency.

Factor 2. Defendants flounder on the second factor as well. Defendants are subject to both a duty not to deceive and a statutory prohibition against misbranding meat. Again, admitting they are intentionally misrepresenting their beef products to consumer, they make the odd claim that requiring that they not misbrand their products would subject them to a differing standard than the FMIA's prohibition against misbranding. This argument has been discussed and rebutted above. All legal regimes in which Defendants operate *allow* honesty.

Factor 3. For the third factor, Defendants ignore that Congress has taken away Country of Origin Labeling regulation from USDA by removing beef and pork from the AMA's jurisdiction. The issue has not languished because the USDA's jurisdiction is limited to offering guidance on voluntary labeling and even that guidance cannot properly be read to allow the agency to ratify  or require fraudulent representations of fact to consumers.[7]

Factor 4. Finally, Defendants attempt to add a request for injunctive relief requested that does not exist. Plaintiff is not asking that Defendants be required add an honest country of origin label to beef, they are asking that Defendants be prohibited from lying that its products are from somewhere they are not if they are going to voluntarily add that information to a label.

In the final analysis, there is no sound basis for deferring to agency expertise here.

---

[7] USDA itself has extensively studied this issue and determined that the label regarding country of origin is misleading to consumers when it is applied to foreign sourced beef. *See* ECF Doc. No. 1, Exhibit 5.

## VI.  DEFENDANTS MISAPPLY AND OVERSTATE THE IMPACT OF *BRISTOL-MYERS* IN THIS CASE.

Defendants' request for dismissal based upon personal jurisdiction is, at best, premature for two important reasons. The first is the consistent theme wherein Defendants seek to avoid the clear allegations of the Complaint that they are the wholesalers that supply at least 80% of the beef consumed by Americans and are therefore responsible and have proximately and intentionally caused restraint of trade harm to Plaintiffs here in South Dakota and across the Nation. In fact, the allegation from the Complaint is that Defendants are supplying foreign beef under an intentionally false label to the trade detriment of the substantial number of beef producers located in South Dakota that sell into the Defendants supply chain which is precisely the type of suit-related conduct creating a substantial connection to the forum state of South Dakota that the holding in *Walden v. Fiore*, 571 U.S. 277 (2014) considers.  This allegation must be accepted as true at this stage. And turning to the notion that putative class members from outside the state must also show that they are harmed by Defendants' suit-related conduct in South Dakota which Defendants  attempt to impose from *Bristol-Myers Squibb Co. v. Superior Court*, —— U.S. ——, 137 S. Ct. 1773, 198 L.Ed.2d 395 (2017)-- this Court has the benefit of recent Circuit jurisprudence rejecting such an application.  The United States Court of Appeals for the Seventh Circuit recently held that "the principles announced in *Bristol-Myers* do not apply to the case of a nationwide class action filed in federal court under a federal statute." *Mussat v. IQVIA, Inc.*, 2020 WL 1161166, at *1 (7th Cir. Mar. 11, 2020)

The Second way that the Motion to Dismiss as to out of state class members is premature on grounds of lack of personal jurisdiction is even more simple. The day after the Seventh Circuit's decision in *Mussat* was issued, the United States Court of Appeals for the D.C. Circuit t held that

"prior to class certification, the potential class and its potential members and their potential claims are just that: potentials. Personal jurisdiction need not be established over these hypothetical parties and claims because they are not before [the court]." *Molock v. Whole Foods Mkt. Group, Inc.*, 2020 WL 1146733, at *4 (D.C. Cir. Mar. 10, 2020)(internal citation omitted). There has been no class certification and no discovery related to that certification yet. *Bristol-Myers* does not serve to deprive the Plaintiffs of certifying a national class at this juncture.

Moreover, and perhaps of greater poignancy, this Court has pendent personal jurisdiction with respect to these national claims at this time. Where multiple claims "arise out of the same nucleus of operative facts" and there is personal jurisdiction over one claim, the Court can exercise "pendent personal jurisdiction" over the other claims. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 335 F. Supp. 2d 126, 128 (D. Me. 2004). "'It is often reasonable to compel a defendant to answer other claims in the same suit arising out of a common nucleus of operative facts, [where] it is in the interest of 'judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties.'" *Id.* at 128-29 (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); other punctuation omitted). Courts in the First Circuit, "Second, Third, Fourth, Seventh, Ninth, Tenth, and D.C. Circuits have all recognized pendent personal jurisdiction explicitly." *Id.* at 128 (cited by *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 9 (1st Cir. 2008) as one of "many thoughtful decisions of the district court").

Courts have further exercised "pendent jurisdiction over the claims by the nonresident named plaintiffs" in the face of motions to dismiss that rely on *BMS*. *Allen v. ConAgra Foods, Inc.*, No. 13-01279, 2018 WL 6460451, *8 (N.D. Cal. Dec. 10, 2018) (exercising pendent jurisdiction would "serve the interests of judicial economy, avoidance of piecemeal litigation, and

43

overall convenience of the parties"). In *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840 (N.D. Cal. 2018), the court found the additional burden on defendants from exercising pendent personal jurisdiction over five additional plaintiffs, with claims under two other states' laws, was "de minimis, particularly because the alternative would be for those plaintiffs to file new, separate cases under their states' laws." *Id*. at 863. "The alternative to hearing those claims in a single forum is to populate the dockets of up to fifty federal courts with nearly identical legal and factual issues." *Id*. The "interest in avoiding piecemeal litigation" favored eliminating "the possibility of overlapping nationwide classes, inconsistent outcomes, . . . and an obvious waste of judicial resources." *Id*. Likewise, the "convenience of the parties—including Defendant's—is much better served by having the claims heard in a single forum rather than fifty." *Id*.

"Outside of Illinois, district courts have largely declined to extend *BMS* to the class action context." *Knotts v. Nissan N. Am., Inc.*, No. 17-05049, 2018 WL 4922360, *14 (D. Minn. Oct. 10, 2018) (collecting cases). The majority post-*BMS* rule— retaining national class actions—is better-reasoned. At the outset, *BMS* did not claim it was a drastic change, but only the "straightforward application . . . of settled principles of personal jurisdiction." *BMS*, 137 S. Ct. at 1783. Such a "characterization is hard to square with the extraordinary sea change" of barring national class actions, and "it implausible that [*BMS*] would have done so obliquely." *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 815, 819 (N.D. Ill. 2018) (cited by *Allen*, 2018 WL 6460451, at *7 (*BMS* "could not have intended, in a sideways manner, to so drastically alter class action plaintiffs' ability to choose their forum")). Likewise, Defendants' reading of *BMS* would almost completely invalidate the use of the multi-district litigation statute because transferee courts would lack personal jurisdiction. *Cf.* 28 U.S.C. § 1407.

Moreover, in this action, a federal court is adjudicating federal claims: "where a federal

court presides over litigation involving a federal question, the due process analysis does not incorporate the interstate sovereignty concerns that animated [*BMS*]." *Sloan*, 287 F. Supp. 3d at 859. Courts also recognize there is personal jurisdiction over national classes under Rule 23 because "due process concerns for the defendant in the class action context are far less compelling than in a mass tort such as *BMS*." *Knotts*, 2018 WL 4922360, at *15. The Tenth Circuit has been clear that pendent personal jurisdiction "exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim ... and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim." *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir.2002).

## VII.   AT A MINIMUM IF THE COURT DISMISSES THE COMPLAINT IT SHOULD BE WITHOUT PREJUDICE, THOUGH DEFENDANTS OFFER NO SOUND BASIS FOR DISMISSAL.

Dismissal is not warranted here. Nevertheless, even if the Court determines that it should grant the motion to dismiss it should be without prejudice.  For example, the claims in this matter may be stated with more clarity in an amendment if necessary.

## CONCLUSION

For all of the above-stated reasons, Defendants' motion lacks merit and should be denied.

WHEREFORE, Plaintiffs respectfully request that the Court deny the motions to dismiss and that Plaintiffs be granted all other relief that the Court deems appropriate.

Date: February 13, 2024

WESTERN AGRICULTURE, RESOURCE AND BUSINESS ADVOCATES, LLP

*/s/ A. Blair Dunn*
A. Blair Dunn, Esq.

45

Jared R. Vander Dussen, Esq.
(*Admitted Pro Hac Vice*)
400 Gold Ave. SW, Suite 1000
Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com


LAW OFFICE OF MARSHALL J. RAY

Marshall J. Ray
(*Admitted Pro Hac Vice*)
514 Marble Ave NW
Albuquerque, NM 87102-1815
(505) 312-7598
mray@mralaw.com


PRESTON LAW OFFICES

Ethan Preston, Esq.
(*Admitted Pro Hac Vice*)
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
(972) 564-8340 (telephone)
(866) 509-1197 (facsimile)
ep@eplaw.us


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I filed the foregoing via CM/ECF on this 13th day of February 2024, causing all parties to receive notice via electronic means.

*/s/ A. Blair Dunn*

A. Blair Dunn, Esq.

46