UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| TIM TAYLOR, ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED; AND BRYCE BAKER, ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED; | 3:23-CV-03031-ECS |
| Plaintiffs, | |
| vs. | OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |
| JBS FOODS USA; TYSON FOODS, INC.; CARGILL MEAT SOLUTIONS CORP.; NATIONAL BEEF PACKING COMPANY, LLC; | |
| Defendants. | |

In this case, Plaintiffs allege Defendants have misled the public by selling foreign raised beef under a "Product of USA" label because the meat was *processed* in the United States. The Federal Meat Inspection Act ("FMIA"), which governs meat inspection and label requirements, prohibits false and misleading labels. The twist before the Court is the Food Safety Inspection Service ("FSIS")—the agency that administers the FMIA—has issued guidance allowing Defendants' use of their "Product of USA" label. Defendants contend the FSIS's approval conclusively establishes their compliance with the FMIA's labeling requirements.

The FMIA, however, gives States concurrent authority with the FSIS to enforce the FMIA's misbranding provisions (i.e., that meat labels cannot be false or misleading). Defendants contend the FSIS's guidance approving Defendants' labels preempts any state law or action used to assert such labels are false or misleading. But because the FMIA also delegates its

1

misbranding enforcement to the States, and the FMIA's purpose was to prevent misbranded meat, Plaintiffs' state-law claims for restraint of trade and unjust enrichment survive.  The FSIS's approval does not conclusively establish that a label is not false or misleading.  Plaintiffs' civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, however, is prohibited by the Noerr-Pennington doctrine.  As a result, it must be dismissed.

## I.    Background

Tim Taylor and Bryce Baker (collectively "Plaintiffs") on behalf of themselves and others similarly situated filed a class action antitrust complaint against JBS Foods USA; Tyson Foods, Inc.; Cargill Meat Solutions Corp.; and National Packing Company, LLC (collectively "Defendants") in South Dakota's Sixth Circuit Court.  Doc. 1-3 ¶¶ 18–25.  Plaintiffs are ranchers who domestically sell cattle born, raised, and slaughtered in the United States.  Id. ¶¶ 18–19.  Defendants are meat packers who manufacture, market, distribute, and sell meat throughout the United States, including South Dakota.  Id. ¶¶ 1, 18–19.

According to the Complaint, Defendants have imported live cattle from foreign countries, slaughtered and processed the cattle in the United States, and labeled the resulting beef products as "Products of the USA."  Id. ¶ 9.  Plaintiffs allege these labels are false and misleading in violation of the FMIA.  Id.  Plaintiffs assert they and other similarly situated ranchers are paid less for their domestic cattle as a result of Defendants' allegedly deceptive labeling, which results in increased profits to Defendants.  Id. ¶¶ 35, 42.  Plaintiffs contend these labels deceive consumers into believing that all of Defendants' beef originated from cattle born and raised in the United States even though some products include beef born and raised outside of the United States.  Id. ¶ 9.  Plaintiffs ultimately claim Defendants (1) violated South Dakota's restraint of trade statute, (2) violated RICO, and (3) were unjustly enriched.  Id. ¶¶ 58–80.  Plaintiffs seek

damages and injunctive relief against Defendants' alleged unlawful and deceptive practices.  Id. ¶¶ 68, 72, 80.  Defendants removed the case to this Court pursuant to the Class Action Fairness Act.  Doc. 1.

After removal, Defendants moved to dismiss the Complaint.  Doc. 22.  Defendants assert that all of Plaintiffs' claims fail as a matter of law for several reasons.  Doc. 23 at 12–14.  First, Defendants allege Plaintiffs' state-law claims are preempted by the FMIA's express preemption clause.  Id. at 21.  Second, Defendants contend Plaintiffs' claims are barred by the dormant Commerce Clause because they discriminate against foreign and interstate commerce.  Id. at 24–28.  Third, Defendants maintain their labels are authorized by the FSIS and as such Plaintiffs' do not have a valid restraint of trade claim as Plaintiffs' alleged injuries do not stem from Defendants' conduct.  Id. at 28–29.  Fourth, Defendants contend Plaintiffs' restraint of trade claim is time-barred.  Id. at 30–31.  Fifth, Defendants assert Plaintiffs have failed to properly state a claim for unjust enrichment and, even if they did, the claim is barred by existing contracts. Id. at 31–32.  Sixth, Defendants maintain Plaintiffs' civil RICO claim is barred for multiple reasons, including the Noerr–Pennington doctrine.  Id. at 32–37.  Seventh, Defendants contend Plaintiffs' claims should be dismissed under the primary jurisdiction doctrine because the FSIS and USDA are the proper parties to determine these matters.  Id. at 37–38.  Finally, Defendants contend the Court should partially dismiss claims by out-of-state putative class members for lack of personal jurisdiction.  Id. at 38–39.

Plaintiffs resist Defendants' motion in its entirety.  See Doc. 30.

## II.    Legal Standard

Rule 12(b)(6) permits a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Although a complaint need not contain detailed factual allegations to survive a motion to dismiss under Rule 12(b)(6), it must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

On a motion to dismiss under Rule 12(b)(6), "[c]ourts must accept the plaintiff's factual allegations as true" and construe all reasonable inferences in the plaintiff's favor "but need not accept a plaintiff's legal conclusions." Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012). When ruling on a Rule 12(b)(6) motion, a court generally must ignore materials outside the pleadings, but it may "consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Dittmer Props., L.P. v. FDIC, 708 F.3d 1011, 1021 (8th Cir. 2013) (cleaned up). The consideration of such items "does not convert a motion to dismiss into one for summary judgment." Waldner v. N. Am. Truck & Trailer, Inc., 277 F.R.D. 401, 406 (D.S.D. 2011) (citing State ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999)). As the moving party under Rule 12(b)(6), Defendants bear the burden of proving that no claim exists.

4

See 5B Charles Alan Wright et al., Federal Practice and Procedure § 1357 (4th ed.), Westlaw (database updated July 2024).

**III.    Preemption**

Defendants first contend that federal law preempts Plaintiffs' state-law claims.  Doc. 23 at 10.  Defendants assert the FMIA, which prohibits states from imposing requirements in addition to or different than federal labeling requirements, expressly preempts Plaintiffs' claims. Id.  Defendants claim that any state-law claim asserting Defendants' labels are false or misleading is preempted by the FMIA.  Id.  Defendants assert this because the FSIS only approves labels that do not "convey[] any false impression or give[] any false indication of origin."  Doc. 31 at 13 (quoting 9 C.F.R. § 317.8(a)).  Defendants point to the FSIS's Food Standards and Labeling Policy Book ("Policy Book"),[1] which allows Defendants' practice of labeling meat processed in the United States as a "Product of the USA."  Doc. 23 at 16.  In short, Defendants contend the FSIS's approval conclusively determines that Defendants' labels are neither false nor misleading.  For authority, Defendants direct this Court to Thornton v. Tyson Foods, Inc., 28 F.4th 1016 (10th Cir. 2022).  Doc. 23 at 12.  There, the Tenth Circuit affirmed the dismissal of claims similar to those brought by Plaintiffs in this case.  Id.  Defendants maintain that Plaintiffs' claims "should meet the same fate."  Id.

Plaintiffs, on the other hand, believe Judge Lucero's dissent in Thornton was the more reasoned opinion.  Doc. 30 at 12.  Plaintiffs argue the Policy Book Defendants rely on cannot be a basis for preemption because it lacks the force of law.  Id. at 24.  Plaintiffs also maintain the

---

[1] U.S. Department of Agriculture, Food Safety and Inspection Service, Food Standards and Labeling Policy Book (Feb. 2024), available at https://www.fsis.usda.gov/sites/default/files/import/Labeling-Policy-Book.pdf [hereinafter "Policy Book"].

FMIA expressly allows States to enforce its misbranding prohibitions even if the FSIS has already approved the labels in question. Id. at 23–24.

Under the Supremacy Clause, federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Thus, "'[s]tate law must yield' when Congress intends to preempt it." WinRed, Inc. v. Ellison, 59 F.4th 934, 941 (8th Cir. 2023) (quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000)). "Congress can preempt state law in one of three ways: (1) expressly though statutory language like a preemption clause; (2) implicitly when a state law conflicts with or stands as an obstacle to federal law; or (3) implicitly by occupying a legislative field, leaving no room for state law." Id. (cleaned up). Here, the Court looks at the first preemption principle as the FMIA's text has an express preemption provision that reads:

> Marking, labeling, packaging, or ingredient requirements *in addition to, or different than*, those made under this chapter *may not be imposed by any State* or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter, *but any State* or Territory or the District of Columbia *may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary* over articles required to be inspected under said subchapter I, *for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded* and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States.

21 U.S.C. § 678 (emphasis added).

When a "statute 'contains an express pre-emption clause,'" courts "do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" Commonwealth of Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016) (quoting Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 594 (2011)). "Also relevant, however, is the structure and purpose of the statute as a whole as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its

surrounding regulatory scheme to affect business, consumers, and the law." Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996) (cleaned up). Accordingly, it is instructive to consider the FMIA's text *in toto* as well as its legislative history and purpose.

### A. The FMIA

"The FMIA regulates a broad range of activities" related to meat inspection, handling, processing, and labeling. Nat'l Meat Ass'n v. Harris, 565 U.S. 452, 455 (2012). "First enacted in 1906, after Upton Sinclair's muckraking novel The Jungle sparked an uproar over conditions in the meatpacking industry, the Act . . . [is intended] 'to prevent the shipment of impure, unwholesome, and unfit meat and meat-food products.'" Id. at 455–56 (quoting Pittsburgh Melting Co. v. Totten, 248 U.S. 1, 4–5 (1918)).

Under the FMIA, meat products may not be sold "under any . . . labeling which is false or misleading, . . . but . . . labeling and containers which are not false or misleading and which are approved by the Secretary [of Agriculture] are permitted." 21 U.S.C. § 607(d). Accordingly, the FMIA allows the Secretary of Agriculture to ban labels that he believes are false or misleading. § 607(e). The Secretary, however, has delegated his authority under the FMIA to the FSIS. See 9 C.F.R. § 300.2(a). Thus, the FSIS administers the FMIA. Harris, 565 U.S. at 456.

The FSIS manages a label approval program aimed at preventing meat from "bear[ing] any false or misleading marking, label, or other labeling and [that] no statement, word, picture, design or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling." 9 C.F.R. § 317.8(a). Accordingly, "the FSIS requires manufacturers to obtain preapproval of labels before using such labels on their products." Thornton, 28 F.4th at 1021 (citing 9 C.F.R. § 412.1(a)). "[T]o help manufacturers . . . prepare product labels that are truthful and not

misleading," the FSIS issues a Policy Book, which "is a composite of policy and day-to-day labeling decision[s], many of which do not appear in" the applicable regulations.  Policy Book at 2–3.  According to the Policy Book, a label "may bear the phrase 'Product of USA'" if "[t]he product is processed in the U.S. (i.e., is of domestic origin)." Id. at 147.  "This label applies to products that, at a minimum, have been prepared in the United States and does not mean that the product is derived only from animals that were born, raised, slaughtered, and prepared in the United States." Thornton, 28 F.4th at 1022 (cleaned up).  Ultimately, Plaintiffs contend Defendants' labels are false and misleading even if approved by the FSIS—a fact Plaintiffs dispute. See Doc. 30 at 45; Doc. 35 at 2.  Because determining whether Defendants' labels are approved by the FSIS may influence whether Plaintiffs' causes of action are preempted, this Court will first address whether Defendants' labels have been approved before addressing whether Plaintiffs' claims can be used to enforce the FMIA's false and misleading prohibition.

### B.  Judicial Notice

Defendants ask this Court to take judicial notice of the FSIS's approval of their labels. Doc. 23 at 20–21; Doc. 31 at 10 n.2.  Plaintiffs, on the other hand, contend that Defendants' labels have not been approved by the FSIS.  Doc. 30 at 45; Doc. 35 at 2.

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Am. Prairie Const. Co. v. Hoich, 560 F.3d 780, 796–97 (8th Cir. 2009) (quoting Fed. R. Evid. 201(b)).  "The court may take judicial notice at any stage of the proceeding."  Fed. R. Evid. 201(d).  "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be

used in determining that a fact is beyond controversy under Rule 201(b)." Am. Prairie Const., 560 F.3d at 797 (cleaned up).

Defendants argue the FSIS "approved" their labels given its definition of "Product of USA" in their Policy Book. Doc. 23 at 12, 13; Doc. 31 at 10, 17, 23. Prior to March 19, 2023, the FSIS approved country of origin labels generically if meat packers' labels complied with the definition contained in the Policy Book.[2] The FSIS, however, recently issued a new Final Rule that redefines "Product of USA."[3] Although the Final Rule went into effect on May 17, 2024, it gave packers until January 1, 2026, to comply with the new definition.[4] Plaintiffs do not dispute that Defendants' products comply with the Policy Book's previous "Product of USA" definition. Accordingly, because Defendants' "Product of USA" labels complied with the Policy Book's definition, the FSIS approved them, albeit generically, and although the FSIS has changed the definition, Defendants continue to comply with this definition given the Final Rule's extended compliance date. Thus, the fact that the FSIS approved Defendants' labels under its prior definition of "Product of USA" is judicially noticed. See United States v. Eagleboy, 200 F.3d

---

[2] See 9 C.F.R. § 412.2(b) (2014) ("Labels that bear claims and statements that are defined in FSIS's regulations or the Food Standards and Labeling Policy Book (except for natural and negative claims), such as a statement that . . . has geographical significance . . . or makes a country of origin statement on the label of any meat or poultry product 'covered commodity,' and that comply with those regulations are also deemed to be generically approved by the Agency without being submitted for evaluation and approval.").

[3] The new definition allows the "Product of USA" label "only if the product is derived from animals born, raised, slaughtered, and processed in the United States, or in the case of a multi-ingredient product, if: (1) All FSIS-regulated products in the multi-ingredient product are derived from an animal born, raised, slaughtered, and processed in the United States; (2) all other ingredients, other than spices and flavorings, are of domestic origin; and (3) the preparation and processing steps for the multi-ingredient product have occurred in the United States." U.S. Department of Agriculture, Food Safety and Inspection Service, Final Rule FSIS-2022-0015 at 3, available at https://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-2022-0015-Final.pdf.

[4] See id. at 1.

1137, 1140 (8th Cir. 1999) ("Court may take judicial notice of agency documents." (cleaned up)).

Despite the approval of Defendants' labels, this Court must still determine whether this approval preempts Plaintiffs' causes of action attacking Defendants' labels.

### C. FMIA's Labeling Requirements

Plaintiffs bring state-law claims challenging Defendants' practice of importing cattle from other countries, slaughtering or processing them in the United States, and labeling the resulting meat a "Product of the USA." Doc. 1-3 ¶¶ 58–72. Plaintiffs maintain Defendants' labels are false or misleading in violation of the FMIA and that they can enforce the FMIA through claims under South Dakota law. Doc. 23 at 13–15. Defendants counter that any state law being used to claim their products are "misbranded" is preempted because the Policy Book allows labels to "bear the phrase 'Product of USA'" as long as "[t]he product [was] processed in the U.S." Policy Book at 147. Defendants claim that because their labels are approved—they are conclusively neither false nor misleading under the FMIA. Doc. 23 at 22.

Given the FSIS's approval of the "Product of USA" label and their regulations prohibiting false or misleading labels, this Court must consider what weight to give the agency's interpretation of the statute and their view on whether the labels at issue are false or misleading. See Medtronic, 518 U.S. at 496 ("The ambiguity in the statute—and the congressional grant of authority to the agency on the matter contained within it—provide a 'sound basis' for giving substantial weight to the agency's view of the statute." (internal citation omitted) (citing Chevron U.S.A. Inc. v. Nat. Res. Def. Council, 467 U.S. 837 (1984)). This is necessary given the Supreme Court's recent decision in Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024), that overruled Chevron, which gave deference to agency interpretations of law.

In Loper, the Supreme Court noted "[t]he Framers . . . envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts.'" Id. at 2257 (quoting The Federalist No. 78, p. 525 (J. Cooke ed. 1961) (A. Hamilton)). "To ensure the 'steady, upright and impartial administration of the laws,' the Framers structured the Constitution to allow judges to exercise that judgment independent of influence from the political branches." Id. (quoting No. 78, at 522 (A. Hamilton)). Accordingly, "[t]he views of the Executive Branch [can] inform the judgment of the Judiciary, but [cannot] supersede it." Id. at 2258; see also id. at 2267 ("Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.").

Historically, the United States Supreme Court has "often treated agency determinations of *fact* as binding on the courts, provided there was 'evidence to support the findings.'" Id. at 2258 (quoting St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51 (1936)). The Supreme Court, however, has not always "extend[ed] similar deference to agency resolutions of questions of *law*." Id. Instead, the Supreme Court has "made clear, repeatedly, that '[t]he interpretation of the meaning of statutes, as applied to justiciable controversies,' was 'exclusively a judicial function.'" Id. (quoting United States v. Am. Trucking Assns., 310 U.S. 534, 544 (1940)). On this basis, the Supreme Court reemphasized the court's role in interpreting statutes:

> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority and ensuring the agency has engaged in reasoned decisionmaking within those boundaries.

Id. at 2263 (cleaned up).

Ultimately, the <u>Loper</u> Court reemphasized that "the judiciary is the final authority on issues of statutory construction." <u>Id.</u> at 2266 (quoting <u>Chevron</u>, 467 U.S. at 843 n.9); <u>see</u> <u>Marbury v. Madison</u>, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Here, the Court must determine whether the FMIA gives authority to States to enforce its misbranding prohibition when the FSIS has already approved the label, which only occurs—per their own regulations—if the label is not "false or misleading." 9 C.F.R. § 317.8(a). In answering this question, the Court must give the statute "'the reading [it] would have reached' *if no agency were involved*." <u>Loper</u>, 144 S. Ct. at 2266 (emphasis added) (quoting <u>Chevron</u>, 467 U.S. at 843 n.11).

The parties first quarrel over whether 21 U.S.C. § 607(d)'s two requirements are independent of each other, or put differently, whether an approved label can be false or misleading under the FMIA. To make this determination, this Court first looks § 607(d)'s text. Congress stated that only labels "which are not false or misleading *and* which are approved by the Secretary[5] are permitted." § 607(d) (emphasis added). Thus, "[t]he plain text of the FMIA demonstrates that FSIS approval of a label is not conclusive as to whether the label is unlawfully misleading." <u>Thornton</u>, 28 F.4th at 1031 (Lucero, J., dissenting). The conjunctive "and" mandates both the former (that labels cannot be false or misleading) and the latter (that labels must be approved by the Secretary of Agriculture). <u>See</u> <u>Pulsifer v. United States</u>, 601 U.S. 124, 133 (2024) ("'And,' in grammatical terms, is of course a conjunction—a word whose function is to connect specified items. . . . 'And,' . . . means 'along with or together with.'" (quoting Webster's Third New International Dictionary 80 (1993)); <u>Scialabba v. Cuellar de Osorio</u>, 573

---

[5] Again, because the Secretary of Agriculture has delegated this authority to the FSIS, labels must be approved by the FSIS under the Secretary's authority. <u>See</u> 9 C.F.R. § 300.2(a).

U.S. 41, 70 (2014) (The conjunctive "and" often makes the two phrases "independent command[s]."). Thus, "the 'and' [in § 607(d)] joins [two] individually necessary conditions" for a label to be permitted. Pulsifer, 601 U.S. at 150.

Defendants' argument omits the requirement that labels cannot be false or misleading by immunizing labels from scrutiny if the FSIS approves them. Plaintiffs' argument, on the other hand, gives full effect to both mandates. The FMIA's "not false or misleading" requirement cannot be swallowed up as surplusage by the FSIS's approval. See Brazil v. Auto-Owners Ins., 3 F.4th 1040, 1044 (8th Cir. 2021) (The interpretive canon against surplusage "counsels courts presented with two reasonable interpretations—one that contains surplusage and one that does not—to choose the one without."). This Court must read § 607(d) in its entirety and give full effect to both of its requirements.

Next, the Court turns to the rest of the FMIA's text. In findings contained within the FMIA, Congress expressly claimed "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. Accordingly, Congress found "that regulation by the Secretary *and cooperation by the States* and other jurisdictions as contemplated by this chapter *are appropriate* . . . to protect the health and welfare of consumers." Id. (emphasis added); see also 21 U.S.C. § 661(a) ("It is the policy of the Congress to protect the consuming public from meat . . . that [is] adulterated or misbranded and to assist in efforts by State and other Government agencies to accomplish this objective."). And although the States may not impose additional or different requirements than

those under the FMIA, States may exercise concurrent jurisdiction[6] with the Secretary of

Agriculture to protect consumers from receiving "misbranded" meat.  See 21 U.S.C. § 678.

Relevant here, the term "misbranded" means "meat or meat food product . . . labeling [that] is

false or misleading in any particular."  21 U.S.C. § 601(n)(1).  Thus, Congress did not make the

Secretary the sole arbiter of whether a label is false or misleading.

The FMIA's "false or misleading" definition of "misbranded" in § 601(n)(1)[7] lends

further credence to this interpretation.  See § 601(n)(1)–(12) (Meat is "misbranded" if it meets

one of the FMIA's twelve "circumstances.").  Certain definitions of "misbranded" give the

Secretary authority to prescribe regulations on certain matters and provide "reasonable

variations" and "exemptions" in some cases.  See § 601(n)(5), (7)–(12) (contemplating the

Secretary's role and scope of authority in their definitions).  But because the Secretary is not

mentioned in § 601(n)(1)'s false or misleading definition, a negative implication can be drawn

under the interpretive canon of *expressio unius est exclusio alterius*.[8]  See NLRB v. SW Gen.,

Inc., 580 U.S. 288, 302 (2017) ("The *expressio unius* canon applies only when 'circumstances

support[] a sensible inference that the term left out must have been meant to be excluded.'"

(alteration in original) (quoting Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 81 (2002)); Watt

v. GMAC Mortg. Corp., 457 F.3d 781, 783 (8th Cir. 2006) ("We do not lightly assume that

Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and

our reluctance is even greater when Congress has shown elsewhere in the same statute that it

---

[6] See Concurrent, Black's Law Dictionary (12th ed. 2024) ("1. Operating at the same time; covering the same matters <concurrent interests>. 2. *Having authority on the same matters <concurrent jurisdiction>*." (emphasis added)).
[7] Meat is "misbranded' . . . if its labeling is false or misleading in any particular."
[8] *Expressio unius est exclusio alterius* means the "expression of one thing excludes others not expressed."  Watt v. GMAC Mortg. Corp., 457 F.3d 781, 783 (8th Cir. 2006).

knows how to make such a requirement manifest." (cleaned up)).  As a result, the Court can infer

that Congress did not intend to vest the Secretary as the sole arbiter on truth and deception.  See

Fed'n of Homemakers v. Butz, 466 F.2d 462, 465 (D.C. Cir. 1972) (Secretary of Agriculture's

regulation allowing certain products to be labeled "All Meat," even though they did not contain

only meat, violated § 607(d) and was "misleading and deceptive."); see also Bates v. Dow

Agrosciences LLC, 544 U.S. 431, 442 (2005) (The Supreme Court addressing a similarly worded

preemption statute determined that "States have ample authority to review . . . labels to ensure

that they comply with . . . federal . . . labeling requirements.").

    Notably, the Eighth Circuit has determined that certain interpretations of the term

"misbranded"—including whether a label is false or misleading—are not "committed by

Congress to agency discretion."  Kenney v. Glickman, 96 F.3d 1118, 1125 (8th Cir. 1996) (The

Eighth Circuit made this determination under the Poultry Products Inspection Act ("PPIA") but

noted the PPIA's and FMIA's "misbranding" definitions are essentially "identical.").[9]

Accordingly, the public—whom the FMIA is intended to protect—should have a say in whether

a label is false or misleading.  See id. ("There is nothing in the definition of 'misbranded' that

indicates Congress intended to afford complete discretion to the agency . . . ."); Butz, 466 F.2d at

465 (The Secretary's "expert judgment" did not determine whether a label was misleading "to an

ordinary consumer."); Armour & Co. v. Freeman, 304 F.2d 404, 410 (D.C. Cir. 1962)

(Prettyman, J., concurring) (Under the Meat Inspection Act, the standard for whether a label is

false or deceptive is determined by "the reaction of the ordinary consumer under such

circumstances as attended retail distribution of this product." (quoting United States v. 88 Cases,

More or Less, Containing Bireley's Orange Beverage, 187 F.2d 967, 971 (3d Cir. 1951)).

---

[9] Compare 21 U.S.C. § 453(h) with 21 U.S.C. § 601(n).

Also important to this Court's interpretation is the legislative history of the FMIA.  In particular, President Lyndon B. Johnson's recommendations to Congress on the 1967 amendment to the FMIA (titled the "Wholesome Meat Act"), which he signed into law in December 1967, supports the Court's interpretation.  President Johnson stated: "The recommendations I am making today will help . . . . middle income families—the vast majority of Americans who can afford to enjoy the abundance of the marketplace, but who can ill afford the high cost of deceit, misinformation, and confusion." H.R. Doc. No. 90-57, at 3 (1967).[10]  He also opined that "[i]t should be our goal to provide full assurance of the wholesomeness of all meat products for sale to the [American people].  This assurance can best be developed through a *Federal-State partnership* for consumer protection." Id. at 8 (emphasis added).  The President's remarks, just like the FMIA's text, support Congress's intent to create a "federalist system to protect consumers against false and misleading meat labeling." Thornton, 28 F.4th at 1029 (Lucero, J., dissenting).

The FSIS's Policy Book also supports this interpretation.  As its preface states, the Policy Book is only "*guidance* to help manufacturers . . . prepare product labels that are truthful and not misleading." Policy Book at 2 (emphasis added).  An agency's non-binding guidance is generally not entitled to preemptive effect.  See Holk v. Snapple Beverage Corp., 575 F.3d 329, 340 (3d Cir. 2009) ("FDA's policy statement regarding use of the term 'natural' is not entitled to preemptive effect."); Adewol v. Frickenschmidt Foods LLC, No. 22 CV 254, 2023 WL 2645557, at *3 n.2 (E.D. Mo. Mar. 27, 2023) (collecting cases); Martinez v. Mead Johnson & Co., No. 22-CV-00213, 2022 WL 15053334, at *8 (C.D. Cal. Oct. 22, 2022) ("[T]he advisory nature of

---

[10] Full presidential remarks available at:
https://heinonline.org/HOL/P?h=hein.leghis/wlsma0001&i=29.

the guidance renders it inert from the standpoint of the preemption doctrine."); see also Saint

Marys Hosp. v. Leavitt, 535 F.3d 802, 807 (8th Cir. 2008) (An agency's manual that is "not

subjected 'to the rigors of notice and comment' is not entitled to substantial deference.").

Elaborating on the non-binding effect of the Policy Book, the FSIS's own regulations

contemplate that approved labels can still be "false or misleading." See 9 C.F.R. § 412.2 ("If the

Agency finds that an establishment is using a false or misleading label, it will institute . . .

proceedings . . . to revoke the approval for the label."); Id. § 500.8 ("FSIS may rescind . . .

approval of false or misleading . . . labels . . . .").

        The FSIS's regulations allowing them to rescind approval of false or misleading labels is

reinforced by a study prepared for the FSIS stating that only "16% of eligible consumers

identified the correct definition for the 'Product of USA' . . . (i.e., the product must be processed

in the United States; the animals can be born, raised, and slaughtered in another country)."[11]

This study led the FSIS to publish the Final Rule[12] amending its "Product of USA" definition.[13]

See Doc. 35-1 at 10–11, 16.  Despite the FSIS's past and present takes on the "Product of USA"

label and whether they believe it was misleading or not to consumers, courts "no longer treat [an

agency's] views as controlling or even 'especially informative.'"  Quito-Guachichulca v.

---

[11] Sheryl C. Cates et al., RTI International, Analyzing Consumers' Value of "Product of USA"
Labeling Claims 8 (2022) (prepared for the U.S. Department of Agriculture, Food Safety and
Inspection Service), available at
https://www.fsis.usda.gov/sites/default/files/media_file/documents/Analyzing_Consumers_Valu
e_of_PUSA_Labeling_Claims_final_report.pdf.
[12] See Final Rule FSIS-2022-0015 supra n.3.
[13] Defendants argue that the FSIS's recent rulemaking process confirms that Plaintiffs' claims
are preempted because the FSIS is the appropriate decisionmaker on labeling issues.  Doc. 31 at
8–9.  This contention, however, runs afoul the plain language of the FMIA, which allows States
and the FSIS to concurrently enforce the FMIA's misbranding prohibitions.  See 21 U.S.C.
§ 678.  Moreover, Defendants cannot shift the blame solely to the FSIS because Defendants
acknowledge their "Product of USA" labels are not mandatory.  Doc. 31 at 17–18.

Garland, 122 F.4th 732, 735 (8th Cir. 2024) (quoting Loper, 144 S. Ct. at 2267).  Thus, the

FSIS's guidance in their Policy Book does not conclusively determine whether the label at issue

is false or misleading.

Ultimately, against the backdrop of the FMIA's text, history, and purpose, which

indicates a unified federalist approach to protecting the health and welfare of consumers by

ensuring that "meat distributed to them is wholesome, not adulterated, and properly marked,

labeled, and packaged," 21 U.S.C. § 602, labels are permitted only if they are not false or

misleading *and* approved by the Secretary—both of which are necessary requirements

independent of one another.  And because under the FMIA States have concurrent authority with

the Secretary to impose "'equivalent' state provision[s]," Harris, 565 U.S. at 467 n.10, this

Court must next determine whether Plaintiffs' state-law claims impose equivalent labeling

requirements to the FMIA's misbranding prohibitions.

### D.  Do Plaintiffs' Claims under South Dakota Law Mandate Labeling Requirements "in addition to, or different than," the FMIA's Requirements

"The [FMIA's preemption] clause prevents a State from imposing any additional or

different—even if non-conflicting—[marking or labeling] requirements that fall within the scope

of the Act . . . ."  Harris, 565 U.S. at 459–60.  States, however, can regulate "conduct that . . .

violates the FMIA."  Id. at 467 n.10 (citing 21 U.S.C. § 678).  The Supreme Court has previously

held that state-law claims imposing requirements of a federal statute with almost identical

language as the FMIA[14] were not preempted as long as they were "equivalent" or "parallel" to

the federal law requirements.  Bates, 544 U.S. at 447.  Thus, although the FMIA prevents laws

---

[14] Compare 7 U.S.C. § 136v(b) (States are prevented from imposing "any *requirements* for
labeling or packaging *in addition to or different from* those required under this subchapter."
(emphasis added)); with 21 U.S.C. § 678 ("Marking, labeling, packaging, or ingredient
*requirements in addition to, or different than*, those made under this chapter may not be imposed
by any State . . . ." (emphasis added)).

imposing labeling requirements differing from the FMIA, "[i]t does not, however, pre-empt any state rules that are fully consistent with federal requirements." Id. at 452; see also id. at 451 ("Private remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of [the statute].").

This Court applies the two-part Bates test to determine whether state law is preempted. Under the Bates test, state law is preempted only if it is: (1) "a requirement '*for labeling or packaging*'"; and (2) "impose[s] a labeling or packaging requirement that is '*in addition to or different* [than] those [made under the FMIA].'" Id. at 444. "[A] state-law labeling requirement must in fact be equivalent to a requirement under [the FMIA] in order to survive pre-emption." Id. at 453. The Supreme Court further instructed:

> In undertaking a pre-emption analysis at the pleadings stage of a case, a court should bear in mind the concept of equivalence. To survive pre-emption, the state-law requirement need not be phrased in the *identical* language as its corresponding [FMIA] requirement; indeed, it would be surprising if a common-law requirement used the same phraseology as [the FMIA]. If a case proceeds to trial, the court's jury instructions must ensure that nominally equivalent labeling requirements are *genuinely* equivalent.

Id. at 454. "A requirement is a rule of law that must be obeyed; an event, such as a jury verdict, that merely motivates an optional decision is not a requirement." Id. at 445. In this case, Plaintiffs' state-law claims are requirements if they "set a standard for a product's labeling that the [Defendants'] label is alleged to have violated by containing false [or misleading] statements." Id. at 446. Because Plaintiffs' Complaint is based on Defendants' use of an allegedly misleading label, the first part of the Bates test is satisfied.

Thus, all that remains is to determine whether each of Plaintiffs' restraint of trade and unjust enrichment claims are "parallel requirements" to the FMIA. Id. at 447–48. If Plaintiffs' claims are equivalent to the FMIA's requirements, the claims are not preempted under the FMIA. Id. at 452. If the claims are not equivalent, the claims are preempted. Id.

19

### i.    Restraint of Trade

Plaintiffs allege Defendants have violated South Dakota's restraint of trade statutes.  Doc. 1-3 ¶¶ 58–68.  Plaintiffs assert Defendants violated SDCL § 37-1-3.1, which states any "contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful."  Plaintiffs claim Defendants have violated this statute by engaging in a deceitful beef labeling scheme allowing them to compete in an anti-competitive manner by misrepresenting to consumers that all of their beef products originate exclusively from American ranchers and farmers by using a "Product of USA" label.  Doc. 1-3 ¶¶ 29–31, 58–68.  Plaintiffs maintain Defendants' labels misled consumers to buy imported beef at higher prices than they otherwise would have while driving down prices paid to Plaintiffs and other similarly situated domestic beef producers.  Id.

The Eighth Circuit has already determined "unfair trade practice" claims, which relate to—if not encompass—restraint of trade claims, are not preempted by the FMIA.  See United States v. Stanko, 491 F.3d 408, 418 (8th Cir. 2007) (Defendant's "argument that the FMIA has preempted all state unfair-trade-practices[15] laws . . . is meritless. . . . [because] nothing in the text of the FMIA indicates an intent to preempt state unfair-trade-practices laws in general, nor have we found any cases supporting [defendant's] claim that it does so.").  This also seems to be South Dakota's position.  See Doc. 48 (South Dakota's amicus brief asserting the FMIA does not preempt Plaintiffs' restraint of trade claim).  Thus, SDCL § 37-1-3.1 imposes an equivalent requirement as the FMIA: meat labels cannot be false or misleading.  See Bates, 544 U.S. at 447–48; see also Bireley's Orange Beverage, 187 F.2d at 971 (Congress contemplated "the

---

[15] "[T]he term 'unfair trade practices' *can* apply broadly to any inequitable business practice, the meaning it carries here must be determined by reference to the other two enumerated terms— antitrust violations and restraints of trade."  Stanko, 491 F.3d at 416.

reaction of the ordinary consumer under such circumstances as attended retail distribution of this product. . . . What constitutes the norm of common sense and judgment is peculiarly the province of the jury."). Thus, because South Dakota's restraint of trade statute imposes an equivalent requirement to the FMIA, Plaintiffs' first cause of action is not preempted by the FMIA.

### ii. Unjust Enrichment

Plaintiffs also allege that Defendants have been unjustly enriched by misleading consumers about the origin of their beef.  Doc. 1-3 ¶¶ 69–72.  They claim "it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from acting unfairly in competition with Plaintiffs."  Id. ¶ 72.  "To establish a prima facie claim for unjust enrichment in South Dakota, the plaintiff must claim that the defendant (1) received a benefit; (2) the defendant 'was cognizant of that benefit'; and (3) 'the retention of the benefit without reimbursement would unjustly enrich the recipient.'"  United States ex rel. Millin v. Krause, No. 17-CV-01019, 2018 WL 1885672, at *13 (D.S.D. Apr. 19, 2018) (quoting Mack v. Mack, 613 N.W.2d 64, 69 (S.D. 2000)).  "The relevant inquiry in determining whether the recipient was unjustly enriched 'is whether the circumstances are such that equitably the beneficiary should restore to the benefactor the benefit or its value.'"  Id. (quoting Dowling Fam. P'ship v. Midland Farms, 865 N.W.2d 854, 863 (S.D. 2015)).

Plaintiffs' unjust enrichment claim, like their restraint of trade claim, seeks only to impose an equivalent requirement of the FMIA—that Defendants' labels cannot be false or misleading.  South Dakota agrees.  See Doc. 48 (South Dakota's amicus brief asserting the FMIA does not preempt Plaintiffs' unjust enrichment claim).  Thus, Plaintiffs' unjust enrichment claim is not preempted by the FMIA.

## IV.    Dormant Commerce Clause

Defendants next contend Plaintiffs' state-law claims violate the dormant Commerce Clause.  Doc. 23 at 24–28.  Defendants assert the dormant Commerce Clause precludes "Plaintiffs' attempt to use state law to override Congress's decision and impose a discriminatory labeling regime."  Id. at 27–28.  Plaintiffs, on the other hand, claim Defendants' dormant Commerce Clause argument fails because Congress expressly gave concurrent jurisdiction to the States to enforce the FMIA's requirements, and thus the Commerce Clause's power is not "dormant" here.  Doc. 30 at 34–39.  The Court agrees with Plaintiffs.

The Commerce Clause gives Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3. Although it grants power to Congress, the Commerce Clause "also prohibits state laws that unduly restrict interstate commerce."  Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 514 (2019).  "This negative aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." Sarasota Wine Mkt., LLC v. Schmitt, 987 F.3d 1171, 1180 (8th Cir. 2021) (quoting Thomas, 588 U.S. at 514).

Dormant Commerce Clause issues exist only when "the Federal Government has not affirmatively acted."  Wardair Can. Inc. v. Fla. Dep't of Revenue, 477 U.S. 1, 7 (1986).  That, however, is not the case here as "the commerce power of Congress is not dormant, but has been exercised by that body when it enacted the [FMIA]."  Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 472 U.S. 159, 174 (1985); W. & S. Life Ins. v. State Bd. of Equalization of Cal., 451 U.S. 648, 653 (1981).  And "[w]hen Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."  Ne. Bancorp,

472 U.S. at 174. Because Congress expressly gave concurrent jurisdiction to States over misbranding enforcement, 21 U.S.C. § 678, Plaintiffs' state-law claims are "invulnerable to [a] Commerce Clause challenge," W. & S. Life Ins., 451 U.S. at 653. Thus, the dormant Commerce Clause does not bar Plaintiffs' claims.

## V.    Failure to State a Claim

Defendants next contend Plaintiffs have not pled actionable claims. Doc. 23 at 28–37. Defendants contend all of Plaintiffs' claims (restraint of trade, unjust enrichment, and RICO) fail as a matter of law. Id.

### A.  Restraint of Trade

Defendants first claim Plaintiffs failed to adequately state a claim under South Dakota's restraint of trade statute, SDCL § 37-1-3.1, for two reasons. Id. at 28–31. First, Defendants assert Plaintiffs have failed to allege that they have suffered an antitrust injury caused by Defendants' conduct. Id. at 28. Because their labels are approved by the FSIS, Defendants contend "any alleged injury to [Plaintiffs] is not an antirust injury." Id. Second, Defendants assert Plaintiffs' claim is time-barred as it was brought after the four-year statute of limitations period lapsed. Id.

Plaintiffs oppose Defendants' assertions. Doc. 30 at 39–50. Plaintiffs maintain, even if Defendants' labels are approved by the Secretary, Defendants' labels are false or misleading and Plaintiffs can seek a remedy, per the FMIA, under an "equivalent" state-law requirement. Id. at 40–43. As to the statute of limitations argument, Plaintiffs assert that being a rancher does not impart sufficient knowledge on them for the statute of limitations to begin running. Id. at 43. Plaintiffs also claim Defendants' actions are a "continuing violation" of antitrust law, where each violative act (each sale of a mislabeled product) starts the statutory period over again. Id.

South Dakota prohibits "contract[s], combination[s], or conspirac[ies] between two or more persons in restraint of trade or commerce." SDCL § 37-1-3.1. Private parties can sue for equitable relief and damages for violations of South Dakota's restraint of trade statutes. See SDCL § 37-1-14.3. South Dakota's restraint of trade statutes are "taken directly from the Sherman Act, 15 U.S.C. § 1 et seq." Byre v. City of Chamberlain, 362 N.W.2d 69, 73 (S.D. 1985). Accordingly, South Dakota courts give "great weight . . . to the federal cases interpreting the federal statute." Id. at 74. Thus, when interpreting SDCL § 37-1-3.1, this Court will give substantial weight to federal cases interpreting the Sherman Act.

   **i.    Antitrust Standing**

Defendants' argument on the presence of an "antitrust injury" is more aptly defined as an antitrust standing question. See Fischer v. NWA, Inc., 883 F.2d 594, 597 n.5 (8th Cir. 1989) ("[A]ntitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws."). "To bring a[n] . . . antitrust claim, 'a private plaintiff must demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants.'" Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538, 542 (8th Cir. 2015) (quoting In re Canadian Imp. Antitrust Litig., 470 F.3d 785, 791 (8th Cir. 2006)). "An 'antitrust injury' is an 'injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes defendants' acts unlawful." Id. (alteration in original) (quoting Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489 (1977)). Courts must "consider the causal connection between the alleged antitrust violation and harm to the plaintiff, the directness or indirectness of the asserted injury, and the degree to which the alleged damages are speculative." In re Canadian Imp. Antitrust Litig., 470 F.3d at 791. When considering an antitrust claim, courts must understand the term "restraint of trade" has "dynamic potential."

24

Kimble v. Marvel Ent., LLC, 576 U.S. 446, 461 (2015).  Standing is lacking, however, if a "federal statutory and regulatory scheme adopted by the United States" is the source of the plaintiff's injury.  In re Canadian Imp. Antitrust Litig., 470 F.3d at 791.

Defendants claim they cannot be held liable for Plaintiffs' alleged injuries because they are caused by the FSIS's approval of their labels and guidance for what qualifies as a "Product of the USA."  Doc. 23 at 28–29.  As stated above though, the FSIS's guidance does not shield Defendants against the States' concurrent jurisdiction to enforce the FMIA's misbranding prohibitions.  See 21 U.S.C. § 678.  The FSIS's guidance is also voluntary and does not force Defendants to use the "Product of USA" label.  See Doc. 31 at 17–18 (Defendants acknowledging their labels are not mandatory).  Because Defendants chose to use this label, they must ensure it is "not false or misleading."  21 U.S.C. § 607(d).  Accordingly, this Court must determine whether Defendants' alleged false and misleading labeling scheme caused an antitrust injury to Plaintiffs.

The Eighth Circuit has previously held that "false, misleading and deceptive advertising . . . directed at . . . consumers" to prevent "competition in the market place" was an unreasonable restraint of trade.  Int'l Travel Arrangers, Inc. v. W. Airlines, Inc., 623 F.2d 1255, 1268 (8th Cir. 1980).  In International Travel Arrangers, the Eighth Circuit noted that the defendant's advertising campaign aimed at preventing the plaintiff from becoming a competitive threat to the defendant was "not a conventional 'restraint of trade,' i. e., a tie-in, price fixing or territorial division."  Id. at 1259, 1267, n.15 (The Eighth Circuit did note though that the Tenth Circuit had previously held that a "conspiracy to suppress competition through the elimination of competition by unfair means is an unreasonable restraint of trade." (citing Perryton Wholesale, Inc. v. Pioneer Distrib. Co., 353 F.2d 618, 621–22 (10th Cir. 1965)).  After holding that the

defendant's unconventional advertising campaign against the plaintiff was a form of competition

and that antitrust laws seek to protect competition, the Eighth Circuit determined it must evaluate

whether the defendant's competitive practice was "fair, unfair[,] . . . [or] so unfair as to rise to a

level of an unreasonable restraint of trade." Id. at 1267.  Because Plaintiffs do not claim

Defendants engaged in a typical price-fixing conspiracy, the Court will analyze Defendants'

alleged conduct under this same standard.

      Plaintiffs allege that Defendants increased foreign beef prices to consumers and

depressed prices paid to Plaintiffs for domestic beef by putting "Product of USA" labels on *all*

beef processed in the United States.  Doc. 1-3 ¶¶ 8–17, 29, 41–48, 61–67.  Plaintiffs claim this

allowed Defendants to wrongfully benefit from Plaintiffs' environmentally and socially

conscious reputation as domestic beef producers.  Id. ¶ 35.  For these reasons, Plaintiffs allege

Defendants' labeling practices allowed them to compete in a predatory and anti-competitive

manner that damaged Plaintiffs by misleading consumers into giving equivalent value to

domestic and foreign beef.  Id. ¶¶ 8–17, 29, 41–48, 61–67.[16]  Accordingly, Plaintiffs have

sufficiently alleged competition that is "so unfair as to rise to a level of an unreasonable restraint

of trade."  Int'l Travel Arrangers, 623 F.2d at 1267.  Plaintiffs' alleged injury—getting paid less

for their domestic beef because Defendants misled consumers—is therefore the type of injury

"the antitrust laws were intended to prevent."  Insulate SB, 797 F.3d at 542 (quoting Brunswick,

---

[16] See also supra n.11 at 65 (Only "16% of eligible consumers identified the correct definition for
the 'Product of USA' . . . (i.e., the product must be processed in the United States; the animals
can be born, raised, and slaughtered in another country)."); id. at 65–66 ("[C]onsumers
[willingness] to pay for a meat product differed based on the location of each production step.
We found that eligible consumers were willing to pay a premium for meat products where more
production steps took place inside the United States over meat products that were just processed
in the United States. Eligible consumers were willing to pay the greatest price premium for meat
products where all production steps (born, raised, slaughtered, processed) take place in the
United States."); Doc. 1-3 Ex. 5 (same).

429 U.S. at 489). Thus, based on their Complaint, Plaintiffs have standing to sue under § 37-1-3.1.

### ii. Statute of Limitations

Defendants next assert that Plaintiffs' restraint of trade claim is time-barred by the four-year statute of limitations codified at SDCL § 37-1-14.4. Doc. 23 at 30. Plaintiffs claim Defendants' alleged mislabeling began in 2016. Doc. 1-3 ¶ 4. Because this is beyond the applicable four-year statute of limitations, Defendants contend Plaintiffs' claim is barred. Doc. 23 at 30–31. Plaintiffs respond with two arguments. First, Plaintiffs claim they and other similarly situated farmers or ranchers raising beef knew nothing about Defendants' labeling practices. Doc. 30 at 43. Second, Plaintiffs claim a "continuing violation" is occurring in which each sale of mislabeled meat restarts the statute of limitations. Id.

Private citizens are barred from recovering damages for violations of South Dakota's restraint of trade statutes "if [the action] is not commenced within four years after the claim for relief accrues." SDCL § 37-1-14.4. "Generally, the period commences on the date the cause of action accrues, that being, the date on which the wrongdoer commits an act that injures the business of another." In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc) (quoting Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004)); see also Baye v. Diocese of Rapid City, 630 F.3d 757, 760 (8th Cir. 2011) (In South Dakota, if there is no "specific language [in the statute] tying the right to sue to the time when the wrong was discovered," then the "cause[] of action accrue[s] upon occurrence."). Because only the date the injury occurred matters for determining when the statute of limitations begins to run, Plaintiffs' argument regarding whether they and other similarly situated individuals were on notice of Defendants' practices is not, in and of itself, persuasive.

There are several exceptions, however, that "permit a party to file a complaint more than four years after the events that give rise to the cause of action." Varner, 371 F.3d at 1019. The relevant exception alleged by Plaintiffs is the "continuing conspiracy or continuing violation" exception. Id. This exception allows a plaintiff to "bring suit on the basis of, and recover damages for, independent predicate acts occurring within four years of suit, regardless of when the initial injury occurred." Hugh Chalmers Motors, Inc. v. Toyota Motor Sales U.S.A., Inc., 184 F.3d 761, 763 (8th Cir. 1999); see also In re Cattle Antitrust Litig., No. CV 19-01129, 2021 WL 7757881, at *9 (D. Minn. Sept. 14, 2021) ("A continuing violation restarts the statute of limitations period each time the defendant commits a new and independent act that inflicts new and accumulating injury on the plaintiff." (citing In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d at 1063)). Continuing violations generally arise in Sherman Act "claims where multiple defendants are alleged to be part of an ongoing conspiracy." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1052 (8th Cir. 2000). To adequately plead a continuing violation, "Plaintiffs must allege: (1) 'a price-fixing conspiracy;' (2) 'that brings about a series of unlawfully high priced sales' during the class period; and (3) 'sale[s] to the plaintiff[s]'[17] during the class period." In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d at 1068 (quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997)).

---

[17] The Eighth Circuit's holding dealt with plaintiffs who were "direct purchasers who bought tanks directly from [d]efendants." In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d at 1063. The crux of a continuing violation, however, is whether "the plaintiff's interests are repeatedly invaded." Varner, 371 F.3d at 1019 (citing Peck v. Gen. Motors Corp., 894 F.2d 844, 849 (6th Cir. 1990)). Thus, the continuing violation exception is not exclusive to only purchasers of a product. See, e.g., CSX Transp., Inc. v. Norfolk S. Ry. Co., 114 F.4th 280, 290 (4th Cir. 2024) (analyzing whether there was a continuing violation even though plaintiff was a competitor to defendants); Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1090 (10th Cir. 2006) (holding that the continuing violation exception applied when defendants, competitors to plaintiff, continually threatened suppliers not to provide plaintiff with needed inputs).

Defendants assert the FSIS's "Product of USA" approval prevents any conspiratorial price-fixing scheme claim because Plaintiffs knew or should have known the FSIS's definition soon after it was issued. Doc. 31 at 26.[18] Plaintiffs' knowledge of the "Product of USA" definition, however, "is not relevant to the continuing violation analysis." In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d at 1066. Accordingly, Defendants argument regarding Plaintiffs' supposed knowledge is not meritorious. Defendants lone remaining argument is that no price-fixing conspiracy occurred as a matter of law. Doc. 31 at 26.[19] The Court now addresses this argument.

Plaintiffs claim a horizontal restraint of trade, which occurs when there is "a combination, conspiracy or agreement between competitors at the same level of the market to restrain competition." ES Dev., Inc. v. RWM Enters., 939 F.2d 547, 556 (8th Cir. 1991). These agreements "are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 768 (1984).

Plaintiffs claim Defendants "colluded and engaged in [a] collective effort to persuade [the] USDA [and] FSIS to issue and continue to hold out a guidance document that allows [them] to voluntarily and actively deceive the consuming public as to the source of the beef they are consuming with some sort of a stamp of government blessing." Doc. 1-3 ¶ 47. Plaintiffs pled Defendants deceived retail grocers as to the origination of the beef as well. Id. ¶ 49. Exhibits submitted with the Complaint arguably support these contentions. See Doc. 1-3 Exs. 1–4.

---

[18] Defendants cite no legal authority for their position.

[19] Defendants do not address the other elements of the exception. Thus, this Court will assume they are not disputed. See Marcure v. Lynn, 992 F.3d 625, 631 (7th Cir. 2021) (The burden of proof under Rule 12(b)(6) requires "the movant to show entitlement to dismissal.").

Plaintiffs pled this deception led consumers to *pay more for imported beef* while Plaintiffs *received less for their domestic beef.* See id. ¶ 63.[20] Construing the Complaint liberally in the light most favorable to Plaintiffs, they have plausibly alleged an active and ongoing horizontal restraint of trade by contending that Defendants are still selling the mislabeled meat.[21] See In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d at 1071 (holding that a conspiracy does not end simply because it succeeded). Accordingly, Plaintiffs have adequately pled a continuing violation sufficient to restart the statute of limitations. See id. at 1068–69.

## B.  Unjust Enrichment

Defendants next contend (1) that Plaintiffs failed to state a claim for unjust enrichment, (2) that Plaintiffs' claims are barred by contract, and (3) that Plaintiffs conferred no benefit on Defendants. Doc. 23 at 31–32. To establish a prima facie claim for unjust enrichment under South Dakota law, Plaintiffs must show: (1) Defendants "received a benefit"; (2) Defendants were "aware [they were] receiving a benefit"; and (3) "that it would be inequitable to allow

---

[20] See also supra n.11 ("Eligible consumers were willing to pay the greatest price premium for meat products where all production steps (born, raised, slaughtered, processed) take place in the United States."); Doc. 1-3 Ex. 5 (same).

[21] See Doc. 1-3 ¶ 33 ("75% of the beef sold to consumers largely (80%) by Defendants is from foreign cattle not beef that originates exclusively in the United States."); id. ¶ 41 ("Defendants knew and intended for consumers to purchase the Products believing them to be products of the United States when consumers might otherwise purchase a competing product . . . actually born, raised, and slaughtered in the United States."); id. ¶ 45 ("To this day, Defendants continue[] to conceal and suppress the true origination of the Products."); id. ¶ 48 ("Plaintiffs and other members of the Class and Subclass will continue to suffer injury if Defendants' deceptive conduct is not enjoined. . . . Plaintiffs and other American beef producers are prevented from competing fairly in the market, and are otherwise at continued risk of real and immediate threat of repeated injury, including an artificially suppressed price for their cattle."); id. ¶ 64 (Defendants "knowingly combine[d] or collude[d] to capitalize on the reputation of domestic beef producers to make material representations and omissions to consumers . . . which allowed [Defendants] to compete in a predatory and unfair manner in the market.").

[Defendants] to retain the benefit without reimbursing [Plaintiffs]." Mach v. Connors, 979 N.W.2d 161, 172 (S.D. 2022).[22]

Plaintiffs claim that Defendants benefitted from increased profits by using a false label to charge higher prices for foreign beef. Doc. 1-3 ¶¶ 35, 43. Thus, plaintiffs have sufficiently alleged the first element. See Dowling Fam. P'ship, 865 N.W.2d at 863 (Plaintiff must show the thing "is advantageous to the defendant."). As to element two, Defendants assert they did not appreciate or know of, accept, or retain a benefit. Doc. 23 at 31–32. Plaintiffs, however, allege Defendants knew of the benefit of labeling foreign beef as a "Product of USA" and intended for consumers to purchase this product believing it was born, raised, and slaughtered in the United States. Doc. 1-3 ¶¶ 40–42. Thus, plaintiffs have sufficiently alleged the second element.

Defendants primarily dispute the last element. Doc. 23 at 31–32. They claim there is nothing unjust about using "Product of USA" labels approved by the FSIS. Id. at 31. This contention, however, has been largely dealt with above as Defendants chose to "voluntarily" label their products. In any event, "[e]ven assuming [Defendants] did not engage in any wrongdoing, the actual question is whether 'it would be inequitable to allow [them] to retain the benefit without paying for it." Huston v. Martin, 919 N.W.2d 356, 366 (S.D. 2018) (quoting Johnson v. Larson, 779 N.W.2d 412, 416 (2010)); see Qwest Commc'ns Corp. v. Free Conf. Corp., 837 F.3d 889, 899–900 (8th Cir. 2016) ("[U]njust enrichment is appropriate where the beneficiary gains a benefit inequitably, even if the beneficiary does not intend to deprive the

---

[22] See also Krause, 2018 WL 1885672, at *13 ("[P]laintiff must claim that the defendant (1) received a benefit; (2) the defendant 'was cognizant of that benefit'; and (3) 'the retention of the benefit without reimbursement would unjustly enrich the recipient.'" (quoting Mack, 613 N.W.2d at 69)).

benefactor of the benefit."). To understand whether Plaintiffs properly allege the third element, the Court must look to South Dakota jurisprudence for guidance.

The South Dakota Supreme Court has cited with approval the Restatement (Third) of Restitution and Unjust Enrichment. See FarmPro Servs., Inc. v. Finneman, 887 N.W.2d 72, 79 (S.D. 2016); Dowling Fam. P'ship, 865 N.W.2d at 860–65; Highmark Fed. Credit Union v. Wells Fargo Fin. S. Dakota, Inc., 814 N.W.2d 814, 817 n.2 (S.D. 2012); Johnson, 779 N.W.2d at 416. Accordingly, to be unjustly enriched, the benefit received by Defendants "must be something in which the claimant has a legally protected interest, and it must be acquired or retained in a manner that the law regards as unjustified." Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. b (2011). Essentially, "enrichment is unjust if it 'lacks an adequate legal basis.'" Dowling Fam. P'ship, 865 N.W.2d at 864 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b (Enrichment is achieved "unjustly" if a "defendant acquires benefits by wrongful interference with the claimant's rights.")). "Ordinarily, a complaint that alleges profitable wrongdoing by the defendant states a claim for . . . unjust enrichment . . . ." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. e(3). Plaintiffs' Complaint sufficiently alleges profitable wrongdoing by Defendants.

Plaintiffs allege Defendants subsumed Plaintiffs' reputation as environmentally and socially conscious domestic beef producers by mislabeling foreign beef as a "Product of the USA." Doc. 1-3 ¶¶ 35, 71–72. Plaintiffs maintain Defendants' misleading label made their enterprises more profitable by allowing them to produce cheaper products, sell more products, and take away market share from competitors while paying Plaintiffs less for their domestic cattle. Id. ¶ 14. Plaintiffs also claim, if Defendants had not misled consumers and unjustly enriched themselves, consumers would have likely purchased their beef products that actually

derive from cattle born, raised, and slaughtered in the United States. Id. ¶ 41.  Plaintiffs have

therefore sufficiently alleged that Defendants' labeling practices were wrongful and profitable.

Thus, Plaintiffs have adequately pled the last element of an unjust enrichment claim.  See

Infogroup, Inc. v. Database, LLC, 95 F. Supp. 3d 1170, 1196–98 (D. Neb. 2015) (Unjust

enrichment claim was sufficiently pled when defendant "received substantial financial benefit as

a result of tortious and improper conduct, including but not limited to unfair competition and

deceptive trade practices." (cleaned up)).

Defendants, however, still argue that Plaintiffs' claim, even if properly pled as unjust

enrichment, is barred because the parties' rights are controlled by an express contract. Doc. 23 at

31–32.  Unjust enrichment "is not available when the rights and obligations at issue have been

defined by contract." Rindahl v. Malsam-Rysdon, No. 22-CV-04073, 2022 WL 17820909, at

*10 (D.S.D. Dec. 20, 2022) (quoting Dowling Fam. P'ship, 865 N.W.2d at 862).  At the motion

to dismiss stage, the existence of the contract must essentially be undisputed for dismissal.  See

In re Grp. Health Plan Litig., 709 F. Supp. 3d 707, 715 (D. Minn. 2023).  Defendants contend

Paragraph 35 of the Complaint shows that Plaintiffs have been receiving reduced prices for beef

under contracts with Defendants.  Doc. 23 at 31.  Plaintiffs, however, maintain they have not

alleged a contract with Defendants.  Doc. 30 at 44.  Paragraph 35 states:

> America's ranchers and farmers, like Plaintiffs, have spent decades cultivating a
> reputation as an environmentally and socially conscious beef industry.  Since 2015,
> when USDA went silent on [County of Origin Labeling] for beef and pork,
> Defendants *have wrongfully benefited from that reputation, and from the consumer
> trust it engenders, and then misused that consumer trust to pay domestic producers
> 40% less on average per year* for their born and raised American beef that is sold
> alongside foreign beef to the consumer under the same labeling.

Doc. 1-3 ¶ 35 (emphasis added).

Construing the Complaint liberally in the light most favorable to Plaintiffs, the Court

cannot conclusively state that Plaintiffs have contracts with Defendants governing "the rights and

obligations at issue [here]." Dowling Fam. P'ship, 865 N.W.2d at 862. To find otherwise would be to determine that Plaintiffs and the putative class members all have direct contracts with Defendants for every cattle sale. Plaintiffs' Complaint states this is not the case by claiming ranchers are being paid less for their beef at livestock auctions. See Doc. 1-3 ¶ 15.

Defendants' reading of the Complaint also assumes Plaintiffs' supposed contracts with Defendants all contemplate "the rights and obligations" regarding Defendants use of "Product of USA" labels on foreign meat products. See Dowling Fam. P'ship, 865 N.W.2d at 862. Defendants ask this Court to dismiss the unjust enrichment claim because "some" putative class members sell domestic beef directly to Defendants. Defendants' premise is flawed as any alleged contracts governing the sale of domestic beef cannot immunize Defendants from a claim challenging their labeling of foreign beef as a "Product of the USA"—something that is not alleged to be expressly included in the parties supposed contracts. See Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c ("Contract is superior to restitution . . . . the parties' own definition of their respective obligations—assuming the validity of their agreement by all pertinent tests—take[s] precedence over the obligations that the law would impose in the absence of agreement."). In short, Defendants' interpretation of the Complaint contradicts its plain language.

Defendants similarly contend, even if Plaintiffs are making contracts with third parties, those third-party contracts are still somehow sufficient to preclude Plaintiffs' unjust enrichment claim. Doc. 23 at 31. Defendants cite no South Dakota authority for this proposition. This argument rests on the same ground as Defendants' direct contract argument—that Plaintiffs' alleged contracts on the sale of their *domestic* beef relate to Defendants' mislabeling of *foreign* beef. Plaintiffs, however, are not basing their claim on wrongdoing relating to the sale of their

beef to Defendants. They are instead bringing an unjust enrichment claim based on Defendants'
alleged misbranding of foreign beef, which they claim increased Defendants' profitability on
their foreign beef while capitalizing on Plaintiffs' reputation as domestic producers. See
Restatement (Third) of Restitution and Unjust Enrichment § 44 cmt. a (2011) (The Restatement
"authorizes restitution[23] in response to intentional and profitable wrongdoing of which the
claimant is recognizably the victim."); Qwest Commc'ns Corp., 837 F.3d at 900 ("South Dakota
measures damages for unjust enrichment based on the amount the beneficiary received unjustly,
not the amount the benefactor lost."). Thus, even if Plaintiffs have third-party contracts
concerning the sale of domestic beef, they do not preclude an unjust enrichment claim for
Defendants' alleged mislabeling of foreign beef—a right that is completely independent of any
alleged contractual claims Plaintiff could bring regarding the sale of domestic beef. See
Finneman, 887 N.W.2d at 77 n.4 (Restitution is a "body of substantive law in which liability is
based not on tort or contract but on the defendant's unjust enrichment." (quoting Restitution,
Black's Law Dictionary 1507 (10th ed. 2014)).

    Finally, Defendants contend Plaintiffs did not "confer" a benefit on them. Doc. 23 at 31.
Plaintiffs, on the other hand, claim they conferred Defendants the benefit of receiving better
prices for their less desirable foreign beef. Doc. 30 at 44. Generally, "unjust enrichment occurs
when one confers a benefit upon another who accepts or acquiesces in that benefit, making it
inequitable to retain that benefit without paying." Dowling Fam. P'ship, 865 N.W.2d at 862
(cleaned up). South Dakota's unjust enrichment law, however, does not include an express
element requiring that a benefit be conferred by the plaintiff to defendant. See S.D. Civ. Pattern

---

[23] Eighth Circuit "and South Dakota case law [use] 'unjust enrichment' and 'restitution'
synonymously." Qwest Commc'ns Corp. v. Free Conferencing Corp., 920 F.3d 1203, 1205 n.2
(8th Cir. 2019).

Jury Instruction § 30-10-60; Mach, 979 N.W.2d at 172; Dowling Fam. P'ship, 865 N.W.2d at 862–64; Mack, 613 N.W.2d at 69. This is likely because the law of unjust enrichment is "inherent[ly] flexibl[e]." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011). The Restatement (Third) states that an unjust enrichment claim may lie when a defendant engages in "unfair competition," which does not necessarily require the voluntary conferral of benefits. See id. § 1 cmt. b (The Restatement explains that unjust enrichment can occur "when the claimant confers unrequested benefits without obtaining the recipient's agreement to pay for them . . . or when the defendant acquires benefits by wrongful interference with the claimant's rights."); id. § 44 cmt. b ("'Unfair competition' comprises a range of economic torts, all of which will support a claim in restitution to recover profits wrongfully obtained. . . . Other competitive practices prohibited by law, such as deceptive marketing, support a claim in restitution."). So, although Plaintiffs did not voluntarily give Defendants' anything, Plaintiffs still plausibly alleged "profitable wrongdoing by [Defendants]." Id. § 1 cmt. e(3). Thus, Plaintiffs properly pled an unjust enrichment claim.

### C. RICO

Plaintiffs third cause of action against Defendants alleges a civil RICO claim. Doc. 1-3 ¶¶ 73–80. Plaintiffs contend Defendants "acted unfairly and deceptively" by fraudulently labeling beef products to deceive consumers and profited from this deception by using wire transfers. Id. ¶ 76. Plaintiffs assert that Defendants' conduct constitutes "racketeering activity for substantial profits" in violation of RICO. Id.

RICO prohibits "any person employed or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." H & Q Props., Inc. v. Doll, 793

F.3d 852, 855 (8th Cir. 2015) (alterations in original) (quoting 18 U.S.C. § 1962(c)).  To prove a

civil RICO claim, Plaintiffs must demonstrate that Defendants engaged in "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity."  Id. at 856 (quoting Nitro Distrib.,

Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009)).

     "RICO provides a private right of action for any person 'injured in his business or

property by reason of a violation of' its substantive prohibitions."  Crest Const. II, Inc. v. Doe,

660 F.3d 346, 353 (8th Cir. 2011) (quoting Dahlgren v. First Nat'l Bank of Holdrege, 533 F.3d

681, 689 (8th Cir. 2008)).  Notably, however, "RICO 'does not cover all instances of

wrongdoing.  Rather, it is a unique action that is concerned with eradicating organized, long-

term, habitual criminal activity.'"  Id. (quoting Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir.

2006)).

     Civil "RICO claims 'must be particularly scrutinized because of the relative ease with

which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not

support it.'"  Humana, Inc. v. Biogen, Inc., 666 F. Supp. 3d 135, 147 (D. Mass. 2023) (quoting

Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 20 (1st Cir. 2000)).  "[I]n cases

alleging civil RICO violations, particular care is required to balance the liberality of the Civil

Rules with the necessity of preventing abusive or vexatious treatment of defendants."  Id.

(alteration in original) (quoting Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991),

abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997), as recognized in

United States v. Velazquez-Fontanez, 6 F.4th 205, 213 n.2 (1st Cir. 2021)).  "Civil RICO is an

unusually potent weapon—the litigation equivalent of a thermonuclear device."  Id.

"Accordingly, 'courts should strive to flush out non-meritorious RICO allegations "at an early

stage of the litigation.'" Id. (quoting Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir. 1990)).

Defendants contend Plaintiffs' civil RICO claim is barred by the Noerr-Pennington doctrine. Doc. 23 at 35–36.[24] "The Noerr-Pennington doctrine 'is a defense to liability premised on the defendant's actions of exercising [the defendant's] own private rights to free speech and to petition the government." Greenley v. Laborers' Int'l Union of N. Am., 271 F. Supp. 3d 1128, 1143 (D. Minn. 2017) (alteration in original) (quoting Hinshaw v. Smith, 436 F.3d 997, 1003 (8th Cir. 2006)). It originated from the Supreme Court's decision in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961). The Noerr-Pennington doctrine is grounded in the First Amendment's guarantee of the right to petition the government to redress grievances. See Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972); Hufsmith v. Weaver, 817 F.2d 455, 458 (8th Cir. 1987). Because "[t]he right to petition means more than simply the right to communicate directly with the government," the Noerr-Pennington doctrine "necessarily [protects] those activities reasonably and normally attendant to effective petitioning." In re IBP Confidential Bus. Documents Litig., 755 F.2d 1300, 1310 (8th Cir. 1985).

The immunity afforded by the Noerr-Pennington doctrine "has been extended to all claims . . . which are based on the petitioning of the courts or other governmental entities." Select Comfort Corp. v. Sleep Better Store, LLC, 838 F. Supp. 2d 889, 896 (D. Minn. 2012); see Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1080 n.4 (8th Cir.1999) ("[T]he First

---

[24] Because the Court's ruling on the Noerr-Pennington doctrine is dispositive, it does not address Defendants' additional arguments as to why Plaintiffs' Civil RICO claim should be dismissed.

Amendment generally immunizes the act of filing a lawsuit from tort liability under the Noerr-Pennington doctrine.").

Plaintiffs' civil RICO claim is premised on Defendants allegedly engaging in a "collective effort to persuade" the USDA and FSIS to "issue and continue to hold out a guidance document" allowing beef products to be labeled in a manner Plaintiffs believe is deceptive to consumers. Doc. 1-3 ¶ 47. Based on the facts alleged in Plaintiffs' Complaint, the Noerr-Pennington doctrine would appear to bar Plaintiffs' civil RICO claim. The First Amendment allows Defendants to petition the government. Plaintiffs assert their civil RICO claim survives despite this fundamental constitutional protection for one reason—the "sham" exception to the Noerr-Pennington doctrine. Doc. 30 at 37.

The sham exception to the Noerr-Pennington doctrine applies "if the petitioning activities in question were 'sham' and in fact solely intended to cause injury to competitors rather than to obtain governmental action." South Dakota v. Kansas City S. Indus., 880 F.2d 40, 51 (8th Cir. 1989) (citing Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500 n.4 (1988)). The sham exception applies when a defendant's resort to the courts and agencies "is so clearly baseless as to amount an abuse of process." Id. (quoting Razorback Ready Mix Concrete Co. v. Weaver, 761 F.2d 484, 487 (8th Cir. 1985)).

According to Plaintiffs, the sham exception applies because "no reasonable private citizen" could expect Defendants to successfully lobby the USDA to allow the labels currently used on beef products. Doc. 30 at 48. Plaintiffs make this assertion "[d]espite the fact that the Packer lobby was actually successful" in lobbying the USDA to allow the labels Plaintiffs contend defraud American consumers. Id.

In support of this argument, Plaintiffs urge this Court to rely on the standard for applying the sham exception articulated in <u>Bayou Fleet, Inc. v. Alexander</u>, 234 F.3d 852 (5th Cir. 2000). In <u>Bayou Fleet</u>, the Fifth Circuit instructed:

> The sham exception involves attempts to influence public officials for the sole purpose of expense or delay. The exception applies to defendants who use the process as an anticompetitive weapon, rather than those who genuinely seek to achieve an intended result. The evidence must show that a defendant's lobbying activities were "objectively baseless" for the "sham" exception to apply. Lobby activity is objectively baseless if a reasonable private citizen could not expect to secure favorable government action.

<u>Id.</u> at 861–62 (cleaned up). Notably, the standard set forth in <u>Bayou Fleet</u> is virtually identical to the standard used by the Eighth Circuit. <u>See</u> <u>Kansas City S. Indus.</u>, 880 F.2d at 52–53.

After considering this authority and the parties' arguments, this Court believes Plaintiffs cannot avail themselves of the sham exception for two reasons. First, Plaintiffs' own Complaint alleges Defendants' lobbying activities were not "for the sole purpose of expense or delay" as is required to utilize the sham exception. Instead, Plaintiffs' Complaint alleges Defendants "colluded" to advocate for the USDA to adopt a guidance document allowing foreign raised beef products to be labeled as "Products of the USA." Doc. 1-3 ¶ 47. This is not advocacy for the sole purpose of expense or delay. Instead, it is advocacy for the use of a specific label to encompass a specific category of beef products. Thus, Plaintiffs have failed to show that Defendants' lobbying was for the sole purpose of expense or delay.

Second, Plaintiffs' own Complaint alleges the USDA adopted the guidance document sought by Defendants in connection with their lobbying. <u>Id.</u> As a result, Defendants' lobbying efforts cannot be considered "objectively baseless." <u>Bayou Fleet</u>, 234 F.3d at 862 ("Because the [defendants] achieved favorable results, their efforts were, by definition, reasonable."); <u>Kansas City S. Indus.</u>, 880 F.2d at 54 ("Consequently, we hold as a matter of law that [the defendant's] petitioning in the <u>Andrews</u> litigation was not sham and was fully protected under the first

40

amendment because a significant factor in pursing the action was the actual desire to obtain judicial relief and there was a reasonable basis for the action."). To the contrary, Plaintiffs allege they were successful. Therefore, Plaintiffs' civil RICO claim is precluded by the Noerr-Pennington doctrine and is dismissed.

## VI.    Primary Jurisdiction Doctrine

Defendants next ask the Court to dismiss Plaintiffs' claims under the primary jurisdiction doctrine. Doc. 23 at 37–38. Defendants contend Plaintiffs should bring their grievances with Defendants' labeling to the USDA. Id. at 37. Plaintiffs, on the other hand, claim Congress expressly preserved state law remedies in the FMIA and thus this matter need not be referred to an agency. Doc. 30 at 50.

"The doctrine of primary jurisdiction applies to claims 'properly cognizable in court that contain some issue within the special competence of an administrative agency.'" Chlorine Inst., Inc. v. Soo Line R.R., 792 F.3d 903, 909 (8th Cir. 2015) (quoting Reiter v. Cooper, 507 U.S. 258, 268 (1993)). "The doctrine allows a district court to refer a matter to the appropriate administrative agency for ruling in the first instance, even when the matter is initially cognizable by the district court." Access Telecomms. v. Sw. Bell Tel. Co., 137 F.3d 605, 608 (8th Cir. 1998). "No fixed formula exists for applying the doctrine of primary jurisdiction." Chase v. Andeavor Logistics, L.P., 12 F.4th 864, 870 (8th Cir. 2021) (quoting United States v. W. Pac. R.R., 352 U.S. 59, 64 (1956)). Essentially, there are two main reasons courts apply the doctrine. First, "to obtain the benefit of an agency's expertise and experience." Access Telecomms., 137 F.3d at 608. This "is the most common reason for applying the doctrine." Id. "Another reason is to promote uniformity and consistency within the particular field of regulation." Id.

This Court has already determined (in its preemption analysis) that misbranding enforcement is a matter left both to the States and the FSIS. See discussion supra Part III. Thus, dismissing or staying this case so that Plaintiffs can seek a remedy solely from the FSIS and USDA runs afoul the FMIA's text, history, and purpose. See id. Moreover, courts "should be reluctant to invoke the doctrine of primary jurisdiction." United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984). This reluctance could be even greater now in the wake of Loper. Because misbranding enforcement under the FMIA is not solely within the agency's expertise, this Court will not invoke the primary jurisdiction doctrine. See Kenney, 96 F.3d at 1125 ("There is nothing in the definition of 'misbranded' that indicates Congress intended to afford complete discretion to the agency . . . .").

## VII.    Personal Jurisdiction

Defendants lastly assert Plaintiffs' claims on behalf of putative out-of-state class members should be dismissed for lack of personal jurisdiction. Doc. 23 at 38. Defendants maintain, because none of them are headquartered or incorporated in South Dakota, this Court only has specific personal jurisdiction over Defendants as it pertains to in-state Plaintiffs and in-state putative class members. Id. (citing Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255 (2017)). Plaintiffs, however, claim dismissal based on personal jurisdiction is premature for two reasons. Doc. 30 at 53. First, Plaintiffs assert personal jurisdiction restraints do not apply to the same extent as other cases in nationwide class actions. Id. Second, Plaintiffs contend personal jurisdiction need not be established over putative class members until class certification. Id. at 53–54. Defendants did not respond to any of Plaintiffs' arguments.

"Before the Supreme Court decided [Bristol-Myers], there was a general 'consensus . . . that due process neither precluded nationwide or multistate class actions nor required the absent-

class-member-by-absent-class-member jurisdictional inquiry.'" In re Folgers Coffee, No. 21-2984, 2021 WL 7004991, at *5 (W.D. Mo. Dec. 28, 2021) (second alteration in original) (quoting Knotts v. Nissan N. Am., Inc., 346 F. Supp. 3d 1310, 1332 (D. Minn. 2018)).  The only two circuit courts to address this issue both held that Bristol-Myers has not changed the status quo.  See Lyngaas v. Curaden Ag, 992 F.3d 412, 435 (6th Cir. 2021) ("Bristol-Myers Squibb does not extend to federal class actions."); Mussat v. IQVIA, Inc., 953 F.3d 441, 443 (7th Cir. 2020) (same).  Circuit courts have also resoundingly held that personal jurisdiction defenses to claims of unnamed putative class members are unavailable before certification of the class as these putative class members are not yet parties to the case.  See Owino v. CoreCivic, Inc., 60 F.4th 437, 446–47 (9th Cir. 2022) ("Prior to class certification, a defendant does not have 'available' a Rule 12(b)(2) personal jurisdiction defense to the claims of unnamed putative class members who were not yet parties to the case." (cleaned up)); Cruson v. Jackson Nat'l Life Ins., 954 F.3d 240, 250 (5th Cir. 2020) (same); Molock v. Whole Foods Mkt. Grp., 952 F.3d 293, 299 (D.C. Cir. 2020) (same).  Therefore, Defendants' motion to dismiss the putative out-of-state class members is at the very least premature and must be denied.

## VIII.    Order

For the above reasons, and the record as it now exists before this Court, it is

ORDERED that Defendants' Motion to Dismiss, Doc. 22, is granted in part and denied in part.  The motion is granted to the extent that it sought to dismiss Plaintiffs' RICO claim but is denied in all other respects.  It is further

NOTICED that Defendants' "Product of USA" labels were approved by the FSIS under the previous "Product of USA" definition.

DATED this 15th day of January, 2025.

BY THE COURT:

ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE